[No. 1028-2.    Division Two.    February 6, 1975.]

JEWETT-GORRIE INSURANCE AGENCY, INC., *Appellant,* v. JOHN VISSER *et al., Respondents.*

*Milton C. Smith* and *Carney, Stephenson, Siqueland, Badley & Smith,* for appellant.

*Robert L. Beale, Murray, Scott, McGavick, Gagliardi, Graves, Lane & Lowry, Wayne C. Vavrichek, A. R. Hart,* and *Hackett, Beecher & Hart,* for respondents.

PEARSON, J.—The question presented by this appeal is whether the trial court, upon motions for summary judgment, properly dismissed the claims of plaintiff insurance agency (Jewett-Gorrie) against a former employee (Visser) and against an insurance company (CNA) with which the plaintiff had been transacting business. The controversy primarily concerns the payment of commissions arising from group accidental death and dismemberment insurance policies on which CNA is the insurer, and various state employees are the insureds. We affirm the judgment of dismissal for the reasons stated below.

In reviewing an appeal from an order granting summary judgment, we must resolve all reasonable inferences in favor of the plaintiff, and affirm the order only if the pleadings, depositions, admissions, and affidavits considered by the trial court do not establish a genuine issue of *material* fact. *Morris v. McNicol,* 83 Wn.2d 491, 519 P.2d 7 (1974); *Barber v. Bankers Life & Cas. Co.,* 81 Wn.2d 140, 500 P.2d 88 (1972). Stated another way, we may affirm the judgment only if, from all the evidence, reasonable men could reach but one conclusion. *Meissner v. Simpson Timber Co.,* 69 Wn.2d 949, 421 P.2d 674 (1966). Considering then only the plaintiff's own admissions, and the *uncontroverted material* facts, or facts upon which the outcome of the litigation depends, the following statement of this case is presented.

In September of 1958, Jewett-Gorrie was authorized by the State to solicit employees of State agencies to partici-

pate on a voluntary basis in a group accidental death and dismemberment policy with American Casualty Company, which company later merged with defendant Continental National American Group (CNA). This was to be a pilot program, and according to the record was one of the first successful programs of its type in the state. Although the program involved what is called "group insurance," with rates based upon a statewide group rate, each employee received his own individual certificate of insurance and each individually paid the premiums by means of a payroll deduction, as authorized by RCW 41.04.020.[1]

The insurance contract between the state employees and CNA arose by virtue of direct solicitation of the employees by Jewett-Gorrie. When an application of an interested employee was forwarded to CNA, the latter had discretion to accept, reject, or terminate coverage of an employee. It is undisputed that Jewett-Gorrie had no authority to bind CNA, for all the parties repeatedly conceded throughout these proceedings, and it will therefore be assumed for purposes of this appeal, that Jewett-Gorrie was acting in the capacity of an insurance "broker,"[2] or representative

---

[1] RCW 41.04.020 then provided:

"Any employee or group of employees of the state of Washington or any of its political subdivisions, or of any institution supported, in whole or in part, by the state or any of its political subdivisions, may authorize the deduction from his or their salaries or wages, the amount or amounts of his or their subscription payments or contributions to any person, firm or corporation furnishing or providing medical, surgical and hospital care or either of them, or life insurance or accident and health disability insurance: *Provided,* That such authorization by said employee or group of employees, shall be first approved by the head of the department, division office or institution of the state or any political subdivision thereof, employing such person or group of persons, and filed with the state auditor; or in the case of political subdivisions of the state of Washington, with the auditor of such political subdivision or the person authorized by law to draw warrants against the funds of said political subdivision."

[2] A broker is defined by RCW 48.17.020 as follows:

" 'Broker' means any person who, on behalf of the insured, for compensation as an independent contractor, for commission, or fee, and not being an agent of the insurer, solicits, negotiates, or procures

of the insured, rather than as an insurance "agent,"[3] or representative of the company. It is also undisputed by all parties that plaintiff in this case was free to seek companies other than CNA to write such group policies for state employees.

For several years the insurance program continued as thus originally constituted, with Jewett-Gorrie acting as broker and CNA as insurer, and the program grew in size. In 1964 the plaintiff hired defendant John Visser to administer this business, and a written employment contract was entered,[4] whereby Visser agreed that the "ownership"

---

insurance or reinsurance or the renewal or continuance thereof, or in any manner aids therein, for insureds or prospective insureds other than himself."

[3] An agent is defined by RCW 48.17.010 as follows:

" 'Agent' means any person appointed by an insurer to solicit applications for insurance on its behalf, and if authorized so to do, to effectuate and countersign insurance contracts except as to life or disability insurances, and to collect premiums on insurances so applied for or effectuated."

[4] The employment contract read as follows:
"The following stipulations will be made by us:

"I. We will send you a monthly record which will be a copy of the record sent to the American Casualty Co., Reading, Pennsylvania. This record will show the dollar volume produced during that month of operation.

"II. Any premiums reported above $10,401.00 you will participate in on a commission basis of 10% level term. Renewal commissions being non-forfeitable.

"III. It is agreed that this policy being written through the American Casualty Co., through an agreement between them and the Jewett-Gorrie Ins. Agency, Inc., may be subject to revision by the Company and therefore if the Company reduces the commission payable to the Jewett-Gorrie Ins. Agency, Inc. this agreement, as per commissions to John Visser, will be subject to this agreement accordingly.

"John Visser agrees to the following stipulations:

"I. That he will work diligently toward the end of procuring business for the Jewett-Gorrie Ins. Agency, Inc. and that he further stipulates he will make additional contacts to all of the department heads and personnel officers and payroll clerks in all departments in the State and will keep them supplied with literature put out by the American Casualty Co. from time to time. This will consist mainly of application blanks.

of the business was that of Jewett-Gorrie, that his interest would be on a commission basis only, and that all files and records would be kept in the offices of plaintiff. It is admitted that pursuant to this contract the group policy program for state employees was handled primarily by Visser, and that the business proceeded smoothly and successfully until the latter part of 1968, at which time a series of problems developed which have culminated in the instant litigation.

The first and undoubtedly the most serious problem which developed was the commencement by defendant CNA of an action against Jewett-Gorrie, alleging a large-scale misappropriation of premium trust funds. In December of 1968, the plaintiff admitted an indebtedness of $117,000, and made an assignment of the future commissions from the state group policies to CNA. At that time employees' payroll deductions which had been in favor of

"II. That he will do all of the sales promotional activities necessary for the promotion of the family addition to the policy or any other additions that may be resolicited from time to time in the years in the future.

"III. That he agrees that the ownership of the business is that of the Jewett-Gorrie Ins. Agency, Inc. and his interests will be a commission only. That all files and records will be kept in the office of the Jewett-Gorrie Ins. Agency, Inc. and that he will have access to these records at any time he so desires.

"IV. That after the business is established on the books, he will act as liaison and agent for Jewett-Gorrie Ins. Agency, Inc. and will make personal contacts wherever necessary.

"V. It will be mutually agreed by both parties that your death will automatically terminate this contract; however renewals by which the terms of this contract are made nonforfeitable will be payable to your heirs or administrators on the basis of 7%, allowing 3% to go to Jewett-Gorrie Ins. Agency, Inc. for the purpose of paying for help necessary to carry on the business.

"This contract may be terminated at any time by either party upon their thirty days written notice to the other party.

"By: /s/_____
"Vernon C. Jewett, President
"Jewett-Gorrie Ins. Agency, Inc.
"By: /s/_____
"John Visser"

Jewett-Gorrie were also changed, so that collection of the accounts was transferred directly to CNA. Defendant John Visser continued to administer the files on these accounts, but received a share of the commissions and a salary for his services directly from CNA.

Subsequent to the assignment and consequent changes in the administration of the program, the situation between the parties became more strained. It was asserted by CNA that it had been discovered that Vernon Jewett, of the Jewett-Gorrie Agency, had continued to convert or misappropriate premium funds by endorsing, without authority, checks made payable to CNA. Although Mr. Jewett denied any wrongdoing, and attempted to challenge the previous assignment of commissions on the ground that it had been made while he was "under severe mental and emotional stress," a judgment was eventually entered against the Jewett-Gorrie Agency in King County Superior Court in the amount of $54,332.07.

As the relationship between Jewett-Gorrie and CNA became more and more strained, with defendant Visser assuming increasing authority with regard to the state group policies, serious difficulties arose between Visser and the plaintiff. Jewett evidently believed that Visser had been "dealing behind his back" with CNA, and when in the first part of 1970 Visser repeatedly refused to relinquish control of the files on the state group policies, which Visser had been handling, the plaintiff in May 1970 notified Visser that he was fired. Since CNA similarly notified counsel for plaintiff that CNA could no longer continue "any relationship" with Vernon Jewett or the Jewett-Gorrie Insurance Agency, this litigation ensued.

Plaintiff's pleadings asserted three grounds for recovery against defendant Visser. The first ground was an alleged breach of the employment contract between the plaintiff insurance agency and Visser. It was alleged that defendant Visser had breached this contract in several particulars, including refusal to return records and files concerning

state employees to plaintiff's offices, and "Constant dealing behind the plaintiff's back and without the plaintiff's knowledge, consent or approval with the Attorneys of Record for CNA . . ." A second claim against defendant Visser, asserting unfair competition, was predicated upon the allegation that since receipt of the notice of termination sent by plaintiff in May 1970, defendant had used information obtained through his former employment in various attempts to "solicit away" or "undermine" plaintiff's business with regard to the state group insurance contracts with CNA. An amended complaint set forth plaintiff's third claim against defendant Visser, an allegation of a conspiracy with CNA.[5]

Plaintiff's complaint against defendant CNA also asserted three grounds for recovery: (1) breach of an alleged commission agreement with CNA by the payment of such commissions to defendant Visser; (2) tortious interference with plaintiff's alleged "broker's contract" with the State; and (3) conspiracy with defendant Visser.

Based solely upon plaintiff's admissions and upon the undisputed material facts in the record, we are of the opinion that the court properly dismissed all of plaintiff's claims against these defendants. Defendant Visser's motion for summary judgment was the first to be heard by the court, and before the merits of the court's summary judgment dismissing the action against Visser is discussed, a procedural irregularity which occurred should be resolved.

Defendant Visser filed his motion for summary judgment more than 10 days prior to the hearing on the motion as required by Civil Rule 56(c), but the motion recited that it was based upon the deposition of Vernon Jewett. That deposition had not then, nor has it ever, been published. When this fact came to the attention of defendant, counsel attempted to cure this problem by serving, on the day of the hearing, an attorney's affidavit which excerpted perti-

---

[5]No issue is presented in this appeal regarding the trial court's judgment in favor of defendant Visser on a counterclaim for unpaid commissions.

nent portions of the deposition. Plaintiff objected to the untimely filing of this affidavit, and the court's response was to grant a continuance of the hearing from 10:35 in the morning until 1:30 p.m. to allow counsel to reply to the affidavit. Plaintiff assigns error to this ruling of the trial court.

We do not believe the assignment is well taken. The trial court did not abuse its discretion in proceeding to hear the motion for summary judgment, nor was plaintiff prejudiced in any manner by the lack of 10 days' notice of the untimely affidavit. It is not disputed that the deposition of Vernon Jewett had been taken in November of 1971, and that the original of that deposition had been in the possession of plaintiff's counsel up to the time of the hearing on May 30, 1972. Further, the summary judgment was not finally entered until June 12, 1972, allowing plaintiff at least 12 days in which an opposing affidavit could have been filed pursuant to *Cofer v. County of Pierce*, 8 Wn. App. 258, 505 P.2d 476 (1973), if such an affidavit had been deemed essential by plaintiff. As to the necessity of such an affidavit, the record reflects that when the court continued the hearing, counsel was expressly given an opportunity to oppose Visser's untimely affidavit without the necessity of even preparing an affidavit on behalf of plaintiff, by simply reading other parts of the deposition into the record. This opportunity was not utilized by plaintiff. Under these circumstances plaintiff has failed to establish that the failure to timely serve the affidavit constituted prejudicial error.

We turn now to the merits of the trial court's summary judgment dismissing the plaintiff's claims against Visser and CNA. It is uncontroverted that in December of 1968, because of the commencement of an action by CNA to obtain misappropriated premiums, plaintiff made an assignment to CNA of all future commissions arising from the state group policies. Subsequent to this assignment the business was billed directly to CNA rather than through the plaintiff, as had been the practice in the past. With the

plaintiff thus essentially removed from the picture, and the commissions in which Visser was to participate pursuant to his employment contract thus assigned to defendant CNA, Visser had little choice but to either sue plaintiff for material breach of the employment contract, or turn to defendant CNA for remuneration. CNA, of course, remained the insurer of hundreds of state employees, and needed someone to administer these accounts. Accordingly, it was agreed the administration of these accounts would be handled completely by Visser, who had previously been primarily responsible for the accounts as an employee of plaintiff, and CNA began paying a salary as well as a portion of the commissions generated from the business directly to Visser.

Given these undisputed facts, the conclusion is inescapable: because of the serious change in circumstances caused by plaintiff's admitted withholding of premiums, and subsequent assignment of commissions to CNA, as a matter of law the 1964 employment agreement between plaintiff and Visser, as well as any prior agreement between plaintiff and CNA, were completely and mutually abandoned, and new relationships between the parties were formed. *Monroe v. Fetzer*, 56 Wn.2d 39, 350 P.2d 1012 (1960); *Wiegardt v. Becken*, 21 Wn.2d 59, 149 P.2d 929 (1944). The parties having abandoned the terms of their prior agreements, Visser's possession and use of the necessary files, and the negotiations between Visser and CNA, did not constitute a breach of the 1964 employment contract as alleged in plaintiff's first claim against Visser, nor a breach of any contract regarding commissions as alleged in plaintiff's first claim against CNA, nor grounds for a conspiracy as alleged in the third claim against each defendant. We also note that Visser's employment contract with plaintiff did not contain a covenant not to compete upon the termination of his employment.

As to plaintiff's contention that the defendant engaged in unfair competition or tortious interference with plain-

tiff's "broker's contract" with the State, our holding is that no material issue of fact was presented, for plaintiff's own admissions demonstrate that no such cause of action was established.

In the first place, plaintiff argues that defendant Visser used confidential information, or "trade secrets" to unfairly compete in the solicitations of state employees. Aside from the fact that Visser's possession and use of the files on the state group policies were entirely reasonable and lawful, as already indicated, plaintiff admitted that there was nothing in the files that would assist anyone in becoming designated a broker for this business. Plaintiff further admitted that the location and identity of the payroll clerks contacted by Visser was a matter of public knowledge. It is well settled that since Visser was admittedly not bound by a covenant not to compete, and his communications were with individuals whose identities were either well known or easily ascertainable by the public, he was free to solicit business from customers of his former employer, even if he did gain knowledge of such customers while in plaintiff's service. *National School Studios, Inc. v. Superior School Photo Serv., Inc.*, 40 Wn.2d 263, 242 P.2d 756 (1952).

In the second place, plaintiff argues that the defendants, either individually or as a conspiracy, tortiously interfered with plaintiff's "brokerage" relationship with the State. Plaintiff relies upon *Calbom v. Knudtzon*, 65 Wn.2d 157, 396 P.2d 148 (1964), which sets forth, at page 162, the following elements of the prima facie tort of interference with a contractual or business relationship:

> The basic elements going into a prima facie establishment of the tort are (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

Although it may be true that some sort of business expectancy existed between plaintiff and various state employees, plaintiff admitted that there was nothing in the relationship which gave him "a guaranteed time with the business," and that anyone else could at any time simply make a better offer to the State and that would be the end of his business relationship. In other words, the relationship was admittedly terminable at the will of the State. As previously discussed, well before any of the actions alleged to be contractual interference occurred, the employment contract between plaintiff and Visser had been abandoned, leaving Visser free to solicit customers of his former employer by any legitimate means of business competition. *See Calbom v. Knudtzon, supra* at 163; Restatement of Torts § 768 (1939). We find no issue of material fact in the record to indicate that Visser *tortiously* interfered with plaintiff's business expectancy.

One final issue remains which merits some comment, although the issue is not dispositive of the appeal. In these proceedings a rather substantial portion of plaintiff's case has been erected upon the foundation of the letter from Francis Pearson, then known as the chairman of the "Board of Directors" or "Cabinet" of Governor Albert D. Rosellini, which authorized plaintiff to solicit state employees as "Agent of Record" for a group policy in the predecessor company to CNA.[6]

---

[6]

"Jewett-Gorrie Insurance Agency        15 September 1958
18237 Greenwood Avenue
Seattle 33, Washington
Dear Sirs:

"The Board of Directors, at their meeting September 2nd, instructed me to authorize you to proceed as Agent of Record to solicit all state agencies on a voluntary basis for a Group Accident Policy in the American Casualty Company.

"This office will assist you wherever practical in procuring cooperation of the departments, and in assuring payroll deductions.

              "Yours very truly,
              "Francis Pearson
                  Chairman"

Based upon this letter, the plaintiff has argued: (1) that this letter "appointed" the plaintiff agency as "broker of record" on the state group policies; (2) that this "broker of record" appointment has never been changed by Francis Pearson nor any of his successors in the administration of Governor Daniel J. Evans; (3) that "broker of record letters" solicited by defendant Visser from various state agency payroll clerks were ineffectual to change the designated "broker of record"; and (4) the payment of commissions to Visser on this business was actionable. The question of the authority of various State officials to sign such "broker of record" letters and the effect of the letters signed by the payroll clerks has been the subject of much argument and confusion. For example, it is undisputed that the insurance policies at issue, although based upon group rates, are individual contracts between each participating state employee and the insurance company. Yet there is nothing in the record indicating that any individual employees ever designated *anyone* as their broker, nor is it made clear under what authority, if any, a State official could make this designation for the individual employees.

In view of the confusion regarding the effect of these letters upon the "brokerage relationship," it is difficult for this court to understand why the parties did not at any point in the proceedings explore the possibility that the Jewett-Gorrie Insurance Agency, when authorized to solicit state employees, was acting in the capacity of an "agent" of the defendant insurance company, rather than as a "broker" of the state employees. In other words, it is not uncommon for an insurance company to appoint someone as an agent, with his authority limited to soliciting insurance, submitting applications, and performing other incidental acts. Even though the individual may not be authorized to bind the company as to individual insurance contracts, the individual may nevertheless be an "agent," or "soliciting agent" of the insurance company. *See* RCW 48.17.010; 43 Am. Jur. 2d *Insurance* § 159, §§ 144-50 (1969). If the plaintiff was

acting as an agent or representative of defendant CNA, rather than as a broker or representative of the state employees, then the interjection of an issue regarding the authority of State officers to sign "broker of record" letters was the interjection of a "red herring." In this light, the letter from Francis Pearson appears not as a "broker of record" appointment, but simply as an authorization to the plaintiff to proceed as "agent of record," or "soliciting agent" of the defendant CNA.

As previously indicated, however, whether plaintiff's status prior to 1968 is properly characterized as that of a broker or agent does not affect the outcome of this appeal, for there can be no question that *as between each other*, the parties abandoned their prior relationships when plaintiff admitted an obligation arising from the withholding of premiums and assigned the commissions from the state policies to CNA. The new relationships subsequently formed were neither unreasonable, unlawful, nor grounds for a claim by plaintiff against these defendants.

The judgment is affirmed.

ARMSTRONG, C.J., and PETRIE, J., concur.