MICROBIOLOGICAL RESEARCH COR-
PORATION, a Delaware corporation,
Plaintiff and Respondent,

v.

Nadeem M. MUNA, Defendant
and Appellant.

No. 16643.

Supreme Court of Utah.

Jan. 22, 1981.

Steven D. Luster, Curtis J. Drake, Salt Lake City, for defendant and appellant.

John H. McDonald, Salt Lake City, for plaintiff and respondent.

MAUGHAN, Chief Justice:

Plaintiff, Microbiological Research Corporation, hereinafter identified as M.R.C., initiated this action to obtain injunctive relief and damages against its former employee, Muna. Upon trial before the Court, an order was entered enjoining defendant from competing with M.R.C. in any of its product lines or services for a period of two years from the date of entry of the judg- ment and restraining defendant from soliciting M.R.C.'s customers for the sale of products presently manufactured by M.R.C., whose identity and location Muna learned of during the course of his employment. The judgment is reversed and remanded for disposition in accordance with this opinion.

M.R.C. is a Delaware corporation with its principal offices and place of business situated in Bountiful, Utah. At the time of trial M.R.C. was engaged in the production of four medical diagnostic kits, which it sells to hospitals and clinical laboratories to detect human diseases. By utilizing the immunofluorescence technique of tracing diseases, a laboratory can detect lupus erythematosis (A.N.A. kit), Toxoplasmosis (Toxo kit), Herpes I and Herpes II (Herpes kits) and infectious mononucleosis (I.M. kit). M.R.C. also engages in some testing for these diseases.

The defendant, Dr. Muna, was awarded his Ph.D. in Immunology and Microbiology in 1968. From 1956 to 1968, he has worked with the immunofluorescence technique of tracing diseases. In 1966, he, in cooperation with two other scientists, published an article in the *American Journal of Clinical Pathology* describing a procedure to test patients for lupus erythematosis by using immunofluorescence to perform an antinuclear antibody test (A.N.A.). In 1956 and 1957, defendant developed an immunofluorescence test for Herpes virus, while he was at U.C.L.A. While studying for his doctorate at the University of Utah, defendant was taught a technique for growing large batches of tissue culture cells by placing them in Pyrex baking dishes and covering the container with Saran wrap.

In 1968, defendant met a stock broker, Edward J. Mawod, who is currently President of M.R.C. Dr. Muna described a research project in which he was engaged, which had the objective of developing a new method to detect cancer. Mr. Mawod, in association with several others, raised the capital to organize a corporation to develop and market the cancer kit. Microbiological Sciences, Inc., the predecessor to M.R.C., was incorporated and a laboratory was built. By a contract, dated September 4, 1968, Dr. Muna was employed as President and general manager of the corporation. By May 1969, the funds of the corporation were depleted, and the company had been unable to procure the tumors required to develop the cancer detection kit. Dr. Muna suggested the company utilize its existing laboratory facilities to produce an A.N.A. kit. Defendant testified he commenced working on the project in July and had the A.N.A. kit on the market by September 1969. In 1972, M.R.C. began marketing the Toxo kit, and in 1976, the Herpes kit was added to the company's line of products. At the time of trial, there were several competitors to M.R.C. in the manufacture of A.N.A., Herpes, and Toxo kits.

Defendant served as President of M.R.C. until February 1978, when as a culmination of a proxy fight, Mr. Mawod became President. On February 28, 1978, by written agreement, Dr. Muna was employed by M.R.C. as a consultant, research microbiologist and Director of the Laboratory. On July 30, 1978, Mr. Mawod terminated defendant's employment. Thereafter, Dr. Muna initiated plans to manufacture a line of products similar to M.R.C.'s. In September 1978, the corporation commenced this action, and since that time, defendant has been restrained from competing with M.R.C., first by a temporary restraining order, then by a preliminary injunction, and finally by a permanent injunction.

The trial court found that defendant, while President of M.R.C., learned of its confidential, proprietary, and secret methods of operation, such as, clientele list, combinations of chemicals, and methods of production; that this information was of substantial and significant value to the plaintiff in the successful conduct of its business. In the manufacture of the A.N.A. kits, Toxo kits, Herpes 1 and 2 kits, and the I.M. kits, plaintiff had trade secrets, which conferred upon it an advantage in the market place. These trade secrets were developed by defendant for plaintiff's benefit while defendant was employed to develop these human diagnostic kits. Plaintiff's processes for the test kits, taken as a whole, were not known to the industry and were guarded by security precautions. The trade secrets were specifically described as the plaintiff's use of certain chemicals and nutrients in the propagation of its cell lines and its techniques and chemical formulations in the manufacturing process of the kits.

The trial court further found that in February, 1978, defendant lost his bid for re-election as President of M.R.C., and thereafter entered into an employment agreement, dated February 28, 1978. Defendant had previously been employed under a contract, dated September 4, 1968, which he had entered into with plaintiff's predecessor corporation. On February 28, 1978, according to the findings, plaintiff, through its officers and directors, had no knowledge of the existence of the 1968 employment contract; defendant knew of the 1968 contract and the lack of plaintiff's knowledge there-

of. Defendant was found to have failed to reveal and to have deliberately concealed the existence of this agreement, while he was negotiating the 1978 employment contract. The 1968 contract contained conditions limiting defendant's right to compete with plaintiff, which the court found in full force and effect and valid and binding on defendant.

Finally, the trial court found that unless restrained, it was likely defendant would solicit plaintiff's customers which became known to him during his employment and would appropriate for his own use or for others the secret and proprietary information of M.R.C. The use of such information would cause plaintiff irreparable damage, the amount of which could not be exactly established and for which no adequate remedy at law existed.

The trial court concluded as a matter of law that M.R.C.'s formulations of chemicals and nutrients used in the propagation of cells and used in the manufacture of its diagnostic test kits were proprietary information and trade secrets; it would be unjust to allow defendant to use this information for his own benefit or that of others. The defendant should be restrained for a period of two years from competing with plaintiff in its present product liens, to wit, the A.N.A., Toxo, I.M., and Herpes 1 and 2 kits and all of the components therein.

The trial court further concluded that defendant had a fiduciary duty during the negotiation of his 1978 employment contract to reveal to the new officers of the plaintiff the existence and the terms and conditions of his 1968 employment contract and that his concealment thereof nullified the 1978 employment contract.

On appeal defendant challenges the rulings of the trial court in regard to the 1968 and 1978 employment contracts and that trade secrets were involved in the manufacture of the diagnostic test kits.[1] Plaintiff responds that the permanent injunction issued by the trial court can be sustained on two alternative grounds: first, there exist-ed an express contract between the parties prohibiting the conduct enjoined; second, there was an implied obligation on the part of an employee not to reveal trade secrets or other confidential information.

### I. The Contract

The 1978 agreement was entitled "Employment Agreement." Its first provision stated:

"1. All previous employment agreements and understandings in connection therewith are hereby mutually terminated and settled."

In this 1978 agreement, Dr. Muna was employed as a consultant and research microbiologist and as Director of the Laboratory. The contract further provided:

"6. During the term of the agreement Muna shall not act as consultant for, or accept employment from any competitor of Micro nor shall he compete directly or indirectly with Micro.

"7. Micro shall be the owner of all the research data, ideas and materials discovered or developed at Micro by Muna during the term hereof."

Thus, the noncompetition clause was limited to the period of defendant's employment, which terminated in July 1978, about five months after its inception.

The 1968 agreement was entitled a "Management Contract," wherein Dr. Muna was employed as President and General Manager for a period of five years and thereafter from year to year, unless terminated by either party by written notice at least sixty days prior to any anniversary date [September 4] of the agreement. Defendant agreed therein that any and all developments, processes, inventions and/or procedures developed, invented, or processed by him during the term of the agreement would belong to and be the sole and absolute property of the Company.

The 1968 agreement further provided:

"6. Muna agrees that during the terms of this Agreement he will not en-

---

1. During the course of the trial, defendant agreed by stipulation not to manufacture for sale any I.M. kits, although he did not concede any secret processes were involved therein.

gage in any other commercial activity in any way competitive with the business of the Company, or its affiliated companies, and that, for a period of five (5) years after leaving the employ of the Company, he will not engage in any way, directly or indirectly, in any business competitive with the Company or its affiliated companies any [sic] any state in which any of them do business. Muna further agrees that he will not disclose to any other person any information which is the property of the Company or its affiliated companies."

Although the trial court declared the 1978 contract a nullity and the 1968 contract valid and binding on defendant, the actual effect on this action was to nullify provision 1 of the 1978 agreement and to revive Paragraph 6 of the 1968 Management Contract. The other provisions of the 1968 agreement were not invoked, e. g., the requirement that defendant could only be removed as President and General Manager by sixty days written notice prior to September 4, the anniversary date of the contract. The basis of the trial court's ruling was that defendant had a fiduciary duty to reveal the existence of the 1968 contract and specifically paragraph 6 therein to the present officers of the corporation, who had no knowledge of this matter. This ruling cannot be sustained.

Plaintiff's current President, Mawod, testified that at the time the 1978 agreement was signed, he did not know of any other agreement, and defendant did not so inform him. Mr. Mawod further testified that at the time he assumed his position he combed through the files of the company, and he could not locate a written agreement with defendant. Mr. Mawod stated that he did review the minutes of the Board of Directors for 1970 and 1975, wherein there were references to the need of the company

to have a written contract with Dr. Muna. After this action was filed Mr. Mawod contacted plaintiff's former legal counsel, who produced a copy of the 1968 contract from his files.

There was no evidence that Mr. Mawod ever asked Dr. Muna about the existence of any prior written agreements. The concealment found by the trial court can only be inferred by Dr. Muna's failure to speak and the fact there was no copy of the agreement in the files. At the trial the only inquiry of Dr. Muna concerning the 1968 contract involved the identification of his signature, neither counsel pursued any line of questioning concerning this agreement.[2] There was evidence that during the time Dr. Muna was President, the company always employed a business manager and that for a period an executive committee of which Mr. Mawod was a member participated in the management of the company, which negates any exclusive control by Dr. Muna of the company's business records.

Plaintiff's counsel drafted the 1978 agreement; such a document should be strictly construed against M.R.C.[3] There was introduced at trial a copy of an employment agreement, which was drafted in 1974 or 1975 and contained a confidentiality and noncompetition clauses. Initially, only new employees were required to sign such a contract, but subsequently all employees were required to do so. Dr. Muna was never requested to sign such a document, although during the time period of approximately 1974 to 1976 he was not the final authority in the company. Since 1978 all employees were required by plaintiff, as a condition of employment, to execute agreements with noncompetition clauses, the omission of such a clause in Dr. Muna's 1978 contract is consistent with an intentional choice on the part of plaintiff rather than the result of some deliberate concealment on the part of Dr. Muna.

---

2. There is an affidavit in the record in connection with a pretrial motion in which Dr. Muna has sworn that he did not recall ever having received a copy of the 1968 agreement, until the hearing on the preliminary injunction. He further swore at the time he executed the 1978 agreement, he did not remember and was

therefore, not aware of the specific terms of the 1968 contract.

3. *Guinand v. Walton*, 22 Utah 2d 196, 198–199, 450 P.2d 467 (1969); *Skousen v. Smith*, 27 Utah 2d 169, 171, 493 P.2d 1003 (1972).

The finding of the trial court that the officers and directors of plaintiff had no knowledge of the 1968 contract cannot be sustained under the evidence. Plaintiff introduced into evidence Exhibit 28, which Mr. Mawod identified as a document from the business files of the company. This exhibit was the minutes of the first board of directors' meeting on September 4, 1968. The minutes indicate the management contract of Dr. Muna was introduced and discussed. The board then unanimously adopted the following resolution:

"Resolved, that the officers of this corporation shall be and they are hereby authorized and directed to execute and deliver to Dr. Nadeem M. Muna, the president and general manager of the corporation, the management contract presented to this meeting, an executed copy of which shall be inserted in the minute book of the corporation immediately following the minutes of this meeting."

■ A corporation, being once charged with notice of the character of a transaction, continues to be affected by such notice whatever changes may occur in the personnel of its working force. "... A fortiori, notice to the board of directors of a fact, at the time of a transaction in regard thereto, is notice to the corporation, and no subsequent change of directors can require a new notice of such fact ... "[4]

Plaintiff is confronted with a dilemma, unless the board of directors, with full knowledge of all its terms, authorized the 1968 contract employing the company's president, there would be no valid and binding agreement;[5] on the other hand, once the board of directors had knowledge of the contract at the time of the transaction, no subsequent change of personnel requires a new notice of the terms of the agreement.

■ The trial court ruled that defendant had violated his fiduciary duty to plaintiff by his failure to reveal the terms of the 1968 agreement during the negotiations of the 1978 agreement. These negotiations occurred after defendant's removal as a managing officer. When a corporate officer ceases to act as such, because of his resignation or removal, the fiduciary relationship ceases. However, where a transaction has its inception while the fiduciary relationship is in existence, an employee cannot by resigning and not disclosing all he knows about the negotiations, subsequently continue and consummate the transaction in a manner in violation of his fiduciary duties.[6] This exception is well illustrated in *Glen Allen Mining v. Park Galena Mining Company*,[7] wherein the defendants while officers of the company developed and put into motion the plans that ultimately resulted in certain contracts disadvantageous to the corporation. This court ruled that under such conditions, an officer cannot avoid responsibility for violating his fiduciary duties by delaying the final execution of a contract until the expiration of his relation.

■ The aforementioned exception is not applicable in the instant case, for the 1978 employment contract was not the result of plans and negotiations conducted by defendant while he was a managing officer of plaintiff. Furthermore, the plaintiff, as explained ante, had knowledge of the 1968 agreement. There was also substantial evidence that plaintiff, under the direction of Mr. Mawod, had embarked on a course of action of including nondisclosure and noncompetition clauses in its corporate agreements. Under all of these circumstances, the trial court's ruling was erroneous, viz., that the 1978 agreement was a nullity and defendant was bound by the noncompetition clause in the 1968 contract. The contractual relationship of the parties is to be determined in accordance with the 1978 contract, which was drafted by plaintiff's

4. 3 Fletcher Cyclopedia Corporations (1975 Rev.Vol.) Sec. 801, pp. 38–39.

5. 19 Am.Jur.2d, Corporations, Sec. 1081, pp. 528–529; Sec. 1155, pp. 583–584.

6. 3 Fletcher Cyclopedia Corporations (1975 Rev.Vol.) Sec. 860, pp. 203–204; *Bentz v. Vardaman Manufacturing Co.*, Miss., 210 So.2d 35, 41 (1968).

7. 77 Utah 362, 382–383, 296 P. 231 (1931).

scrivener and is thus to be construed accordingly.

The first provision of this agreement, mutually terminating and settling all previous employment agreements, is particularly appropriate because of the radical change of circumstances, viz., Dr. Muna was discharged as chief managing officer and employed as a consultant. This provision is completely consistent with an intention to abandon mutually and completely all prior agreements and to initiate a new relationship.[8] The permanent injunction against defendant cannot be predicated on the 1968 Management Contract, for the 1978 contract constituted a novation and controls the relationship between the parties.

### Trade Secrets

Defendant further contends that plaintiff failed to sustain its burden of proof that trade secrets were involved in the manufacture of the kits. This issue is of particular importance since plaintiff urges the permanent injunction can be sustained on the alternative ground that defendant should be restrained from appropriating or using plaintiff's trade secrets. (This would not be grounds to restrain Dr. Muna from using the test kits to conduct testing, which could have only been sustained under the no competition clause of the 1968 contract.)

A trade secret, whether it be a secret formula, process, pattern, device, compilation of information or otherwise, is under the majority view held to be property, with power in the owner thereof to make use of it to the exclusion of the world or to deal with it as he pleases.[9] As a property right, the trade secret is protected against its appropriation or use without the consent of the owner.[10] The trade secret is a type of intellectual property, in effect, a property right in discovered knowledge.[11]

The threshold issue in every case is whether, in fact, there is a trade secret to be misappropriated. The secret is of value only so long as it remains a secret. The burden is upon the plaintiff to prove its existence as a secret, and there is no presumption in his favor.[12]

"Thus, a unique combination of generally known elements or steps can qualify as a trade secret, if it represents a valuable contribution attributable to the independent efforts of the one claiming to have conceived it. The combination must differ materially from other methods revealed by the prior art. The subject matter of the trade secret must be unknown; it should not be in the public domain nor within the knowledge of the trade, i. e., known only to the owner and possibly several others to whom it was disclosed with the admonition that its secrecy be maintained . . ."[13]

\*   \*   \*   \*   \*   \*

"A secret may not be in the public domain if extensive effort is required to pierce its veil by assembling the literature concerning it and thereby uncover its parts. If this can be readily done by one who is normally skilled in the field and has a reasonable familiarity with its trade literature, the secret may no longer be entitled to protection as such . . ."[14]

An employer to obtain relief must establish that his former employee's product is a copy of his own product, that its method of production was secret and that the former employee has used or intends to use confidential information acquired during his employment. The conflict must be resolved between the employer's right to protect his trade secrets and the employee's right not to be unreasonably hampered in the use of what he has learned during the

8. *Jewett-Gorrie Insurance Agency, Inc. v. Visser*, 12 Wash.App. 707, 531 P.2d 817, 822 (1975).

9. 2 Callman Unfair Competition, Trademarks and Monopolies (3rd Ed.), Sec. 51.1, pp. 349–350.

10. Id. at p. 351.

11. Id. at p. 352.

12. Id., Sec. 53.3, p. 387.

13. Id., p. 388.

14. Id., pp. 391–392.

employment. There must be a delineation between the general knowledge and experience of the employee and the trade secrets of the employer. Furthermore, the employee is protected by the rule that the owner may not arbitrarily pronounce anything a trade secret.[15]

Upon termination of his employment, an employee has the prerogative to use his general knowledge, experience, memory and skill, however gained, provided he does not use, disclose, or impinge upon any of the secret processes or business secrets of his former employer.[16] The distinction between general and special knowledge can only be resolved by a balancing of the conflicting social and economic interests of two desirable goals. The law encourages competition and supports an individual right to exploit his own skill and knowledge; on the other hand, the law should grant established businesses reasonable protection against unfair trade practices.[17] There has not been devised any ready formula to differentiate clearly between general and special knowledge so as to determine the manner and type of information an employee may use. One approach has been to recognize the distinction between the case of an employee, who leaves one employer and uses his own faculties, skill and experience in the establishment of an independent business or in the service of another, and the case of one who uses confidential information, secured solely through his employment, to the harm of his previous employer.

"... Confidential information of an employer, however, loses any protection to which it may have been entitled after it has been merged into the employee's own faculties, skill and experience. Since experience is something a man acquires, a standard must be found to test whether, in a particular case, an employee's experience is such as will permit of its use after termination of the employment, even though it may prove detrimental to his former employer.

"The distinction is between confidential information and *'skill and knowledge of the trade'* or, as one court expressed it, the knowledge which the employee might have acquired in previous employment.[18]

"The distinction between general experience and special knowledge will still be difficult to draw even after the formulation of an arbitrary rule of thumb. The more important an employee's job, the more difficult will it be to separate the knowledge he is free to use from that which should be within the secret sphere of the business owner. Where the employee is an expert in a newly developed science, whose creative mind established a manufacturing department on the basis of his own plans and ideas, or is a man known to and desired by industry, any attempt to draw the line between that which was or has become, by trial and error, a part of his own intellectual equipment and that which he cannot use or divulge without a breach of confidence necessarily involves some injustice to one party. The problem is highlighted by modern industry in which inventors have now become an important addition to management as part of the company team.

\* \* \* \* \* \*

"Complete justice is an ideal difficult to attain. Old-fashioned concepts of loyalty are of no legal significance where complicated technical problems disrupt the balancing of economic interest."[19]

In an action based upon a secret process and unfair competition, the plaintiff must establish the following: (1) his possession of knowledge or information not generally known (i. e., the secret); and either (2) his communication of the secret to the defendant under an express or implied agreement limiting its use or further disclosure,

15. Id., Sec. 54.2, p. 415.

16. Id., Sec. 54.2(a), p. 416.

17. Id., p. 417.

18. Id., pp. 418–419.

19. Id., pp. 420–421.

and the defendant's use thereof in violation of the confidence, to the injury of the plaintiff; or (3) the defendant's acquisition of the secret by some wrongful manner and the use thereof to the plaintiff's damage.[20]

The trial court found that plaintiff had trade secrets in the manufacture of the diagnostic kits, which defendant had developed while an employee. These secrets were identified as certain formulations of chemicals and nutrients in the propagation of cell lines and certain techniques and chemical formulations in the manufacturing process of the kits. Defendant asserts that plaintiff failed to sustain its burden to establish the foregoing were trade secrets on the grounds that all the information was published in the literature, including work done by defendant on the A.N.A. techniques prior to his employment, that the techniques and processes were known to others in defendant's field of expertise, and that the processes and techniques were an integral part of defendant's own skill and knowledge.

Plaintiff called two witnesses to establish the secret nature of its manufacturing process. Both witnesses conceded that M.R.C. provided them with their first opportunity to observe a laboratory involved in the commercial production of test kits; consequently, they were unfamiliar with the technics of other companies. The evidence further established that M.R.C. had competitors producing A.N.A., Toxo and Herpes kits. Both witnesses thought it was unusual to grow the cells on slides in pyrex dishes covered with saran wrap; neither had read in the literature on tissue culture of using this method for mass production of tissue culture slides. Dr. Muna testified that he had learned this technique with all his fellow students in the virology department at the University of Utah. Dr. Muna further testified that at the inception of production of the A.N.A. kit he had utilized coverslips as he had in his tissue culture work prior to his employment with plaintiff. A competitor, Virgo, marketed an A.N.A. kit using slides, which were more convenient; so M.R.C. changed from coverslips to slides.

Plaintiff's witnesses further identified as combinations peculiar to M.R.C. in production of the A.N.A. and Herpes kits: 1) the specific nutrients added to the media in which the cells were grown; 2) the rinsing of the slides three times with sodium bicarbonate; 3) the use of isopropyl alcohol as a fixative.

Plaintiff's witness, Leibovitz, testified there were alternative methods of making media as effective as M.R.C.'s. He further testified that the basic techniques for making A.N.A. and Herpes kits were not difficult; the problem was mass production. He opined that one would have to proceed on the basis of trial and error, using a large number of combinations in order to devise a procedure; he estimated it would take three to six months.

Dr. Muna introduced into evidence the article he wrote in 1966, which described the techniques he utilized in producing the A.N.A. kit for M.R.C. For the tissue culture he used FL, a strain of human amniotic cells, which are currently utilized by M.R.C. in the A.N.A. and herpes kits. The nutrients added to the media, which plaintiff's witness, Dr. Golden, described as black magic, were additives which Dr. Muna had used since he was introduced to tissue culture at U.C.L.A. in 1956. [In the article Dr. Muna had recommended growing the cells in any suitable sustaining media.] Dr. Muna testified that the work described in his article involved standard laboratory procedures in the tissue culture field.

There were two distinctions in the process described in the article and M.R.C.'s process; in the former, the rinse was buffered saline, and the fixative was ether-alcohol; in the latter, the rinse contained sodium bicarbonate and the fixative was isopropyl alcohol. Dr. Muna testified that he used isopropyl alcohol as a fixing agent prior to 1968, but he had used ethyl alcohol on FL cells prior to 1968 because it was a more refined alcohol; in his opinion there was no difference in either as a fixing agent. Oth-

20. Id., Sec. 58.1, p. 478.

er witnesses testified there are several equally effective fixing agents. Neither of plaintiff's witnesses knew whether the use of sodium bicarbonate in the rinse had any effect on the process.

In the production of the Toxo kit both Dr. Muna and Dr. Golden testified the procedures utilized followed those described in a publication of the Center for Disease Control. The only departure from this published procedure was that M.R.C. adds a surface-reducing agent, Tween 80, which is also used by others in the field.

Dr. Marcus, whose process is used by M.R.C. to manufacture the I.M. kit, testified that a competent microbiologist would need nothing further than the information published in the literature and his own general knowledge in order to manufacture the A.N.A., Toxo, and Herpes kits on a commercial basis.

The conclusion is compelling that from the evidence adduced the processes of plaintiff constitute skill and knowledge of the trade and not confidential information. Dr. Muna cannot be enjoined from using his knowledge, skill, and experience in an independent business. It should be further observed that of the chemicals utilized by M.R.C., which it contends are secret, there are alternative choices which Dr. Muna could select in producing the kits.

The instant case is similar to *Abbott Laboratories v. Norse Chemical Corporation*,[21] wherein plaintiff claimed the existence of trade secrets in the areas of manufacture and sales. The court ruled the claim could not be sustained. The court observed that in order to constitute a trade secret, protectible by injunctive relief, Abbott had the burden of proving a formula, process, or compilation of information known only to Abbott or its employees to whom it was necessary to confide in secret. In its analysis the court observed the alleged trade secrets were published and were commonly known in the trade and readily discernable in the chemical engineering field. In the

area of manufacture defendants had utilized basic chemistry for a basic process consisting of a series of well known, published steps. There was no showing the defendants had copied any plans or taken any drawings, designs, specifications, or specific details from Abbott. Each element of the entire process was based on knowledge of chemical engineering, which the former employee acquired by working with the process, applying different engineering techniques at its various stages, and being aware of the outcome. The court characterized this type of information as skill, which cannot be blotted out of an employee's mind and cannot be labeled a trade secret.

The court recognized that the former employee had certain knowledge of particular engineering techniques which could be applied at a given point more advantageously than another technique. This was a result of his training and his experience in his profession rather than a direct copying of Abbott's process, and the skill and knowledge he possessed from working in his profession should inure to his benefit.

In the *Abbott* case, the court further ruled that the customer list was not a trade secret. The list contained only the names and addresses of the customers and the individual to be contacted. There was no complicated marketing data, which had been laboriously compiled, concerning projected market needs of the customer or the customer's market habits. A policy of confidentiality as to the customer list had not been invoked by the company. The court quoted the following:

> " '. . . Written customer lists generally have been regarded as trade secrets when the nature of the industry permits the list to be kept secret and the list cannot be readily duplicated by independent means. The size of the list and the type of information it contains about the customers may be relevant to the latter determination, as may the amount of time and

**21.** 33 Wis.2d 445, 147 N.W.2d 529, 538 (1967).

effort which went into its composition.' " [22]

Abbott argued that it had spent substantial time and money on its customer list. The court responded that the time and money was, in reality, spent on the development of the market which the customer list represented. Defendant was only attempting to sell to this market, and Abbott's customer information, in view of its public nature, should not be protected so as to prevent competition.

■ In the instant case there was neither evidence adduced that defendant had a copy of a customer list or that such a list constituted a trade secret. The order of the trial court compelled defendant to surrender any list, memoranda, or written record of any nature whatsoever, concerning the identity or location of any customer of which he learned during his employment; and to account for any sales made to such a customer since February 28, 1978. In addition, defendant was restrained from soliciting plaintiff's customers, whose identity and location defendant had learned of during the course of his employment.

At the trial the sole evidence in regard to the customers concerned the expenditures in an unidentified sum of plaintiff to develop a market; there was no evidence that by the nature of plaintiff's business extraordinary effort was involved in compiling a customer list. Most of the customers were clinical laboratories and hospitals, the location and identity of which were readily accessible through public sources and trade journals. Plaintiff's evidence concentrated on the fact that a major customer, a distributor in Germany, identified as B.A.G., terminated its contract. However, a specific provision in this contract conferred on B.A.G. the right of termination after ninety days notice, if Dr. Muna were no longer associated with M.R.C.

The principles applicable in the instant case are clearly set forth in *Leo Silfen, Inc. v. Cream*.[23]

"Generally, where the customers are readily ascertainable outside the employer's business as prospective users or consumers of the employer's services or products, trade secret protection will not attach and courts will not enjoin the employee from soliciting his employer's customers. [Citations] Conversely, where the customers are not known in the trade or are discoverable only by extraordinary efforts courts have not hesitated to protect customer lists and files as trade secrets. This is especially so where the customers' patronage had been secured by years of effort and advertising effected by the expenditure of substantial time and money. [Citations]

\* \* \* \* \* \*

"In the absence of express agreement to that effect between the parties, or a demonstration that a customer list has the several attributes of a trade secret, courts, without more, should not enjoin an ex-employee from engaging in fair and open competition with his former employer. The limiting effects upon the former employee with respect to his ability to earn a living are marked and obvious..."

M.R.C. failed to sustain its burden of proof that the names and location of its customers were a trade secret. In addition, the order enjoining defendant from soliciting any customer of whom he gained knowledge during his employment was overly-broad and constituted a restraint of trade.

HALL and CROCKETT,* JJ., concur.

STEWART, J., concurs in result.

WILKINS, J., heard the arguments but resigned before the opinion was filed.

---

22. At p. 541 of 147 N.W.2d.

23. 29 N.Y.2d 387, 328 N.Y.S.2d 423, 278 N.E.2d 636, 639–641 (1972).

* CROCKETT, J., concurred in this case before his retirement.