**UNITED STATES of America, Plaintiff,**

**v.**

**HEALTHWIN–MIDTOWN CONVALESCENT HOSPITAL AND REHABILITATION CENTER, INC.; and Israel Zide, Defendants.**

**Civ. A. No. 78–2297–AAH(Sx).**

United States District Court,
C. D. California.

March 25, 1981.

---

Andrea Sheridan Ordin, U. S. Atty., Frederick M. Brosio, Jr. and Howard Gest, Asst. U. S. Attys., Los Angeles, Cal., for plaintiff.

Myron Roschko, Encino, Cal., for defendants.

*Opinion and Order*

MALETZ, Judge:[1]

This is an action by the United States to recover Medicare funds paid to the Healthwin-Midtown Convalescent Hospital and Rehabilitation Center, Inc. (Healthwin). The defendants are Healthwin and Israel Zide, its former president and owner of fifty percent of its stock.

The facts are as follows: On September 14, 1971, Healthwin was organized in California for the purpose of operating a health care facility. From that date, until November 30, 1974, it participated as a provider of services under the Medicare Act, 42 U.S.C. § 1395 et seq., and received periodic payments from the United States Department

---

1. Judge of the United States Court of International Trade sitting by designation pursuant to 28 U.S.C. § 293(b).

of Health, Education and Welfare (HEW). These payments, which were compensation for the services provided Medicare beneficiaries by Healthwin, were only approximations of the exact amount due; the exact amount was determined by periodic audits conducted by Blue Cross of Southern California which was HEW's agent for the purpose of paying Healthwin and auditing its cost reports. It is undisputed that these audits showed that a series of overpayments had been made to Healthwin in 1972, 1973 and 1974 in the total amount of $30,481.55. It is this sum, plus interest, that the United States seeks to recover here.

Healthwin itself is precluded under California law from defending this action since its corporate powers were suspended due to its failure to pay taxes owing to the State of California. See California Revenue and Taxation Code, Section 23301.[2] Accordingly, the court, on October 24, 1979, ordered that Healthwin's answer in this action be stricken and a default judgment entered.

Against this background, the issue here is whether defendant Zide is personally liable for the Medicare overpayments to Healthwin. As a basis for such liability, plaintiff first argues that the corporate entity should be disregarded under the *alter ego* theory of liability. In the alternative, plaintiff contends that Zide is liable for the overpayments by reason of an alleged violation of the federal priority statutes, 31 U.S.C. §§ 191 and 192. Defendant Zide maintains that he is not liable under either of plaintiff's theories and further claims that he is entitled to an offset by virtue of sums which he says plaintiff owes to Healthwin.

■ We note at the outset that plaintiff's *alter ego* claim must be analyzed in accordance with state law. See, e. g., *Matter of Christian and Porter Aluminum Co.,* 584 F.2d 326, 337 (9th Cir. 1978). And under California law, "[i]ssues of *alter ego* do not lend themselves to strict rules and *prima facie* cases. Whether the corporate veil should be pierced depends upon the innumerable individual equities of each case." *United States v. Standard Beauty Supply Stores, Inc.,* 561 F.2d 774, 777 (9th Cir. 1977). Generally, however, the corporate veil may be pierced when it is shown:

(1) that there ... [is] such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that if the acts are treated as those of the corporation alone, an inequitable result will follow.

*Automotriz Del Golfo De California v. Resnick,* 47 Cal.2d 792, 796, 306 P.2d 1, 3 (1957).

■ With regard to the "unity of interest and ownership" test set out in *Automotriz,* the evidence at trial showed that at all times relevant here, Zide was a fifty percent shareholder of the Healthwin corporation. In addition, Zide had a fifty percent interest in a partnership which owned both the realty in which Healthwin's health care facility was located and the furnishings used at that facility.

■ Zide was also the president of the Healthwin corporation as well as a member of its board of directors and the administrator of its health care facility. While there were other members of the board, they usually did not attend board meetings. Further, only Zide could sign the corporation's checks without the prior approval of another corporate officer, and virtually all the corporation's checks were in fact signed by him. Thus, Zide alone controlled the corporation's operations. Although not dispositive, substantial ownership of a corporation and dominance of its management, as has been shown here, are factors favoring the piercing of the corporate veil. *Associated Vendors, Inc. v. Oakland Meat Co.,* 210 Cal.App.2d 825, 837, 26 Cal.Rptr. 806, 814 (1963); *McCombs v. Rudman,* 197 Cal. App.2d 46, 17 Cal.Rptr. 351, 353–354 (1961).

■ Other factors the courts consider in determining whether the corporate veil should be pierced include: the inadequacy

---

**2.** Rule 17(b) of the Federal Rules of Civil Procedure provides that "[t]he capacity of a corporation to sue or be sued shall be determined by the law under which it was organized."

of the corporation's capitalization or its insolvency; the failure to observe corporate formalities; the absence of regular board meetings; the nonfunctioning of corporate directors; the commingling of corporate and noncorporate assets; the diversion of assets from the corporation to the detriment of creditors; and the failure of an individual to maintain an arm's length relationship with the corporation. See, e. g., *Minton v. Cavaney*, 56 Cal.2d 576, 15 Cal. Rptr. 641, 643, 364 P.2d 473, 475 (1961); *Arnold v. Browne*, 27 Cal.App.3d 386, 103 Cal.Rptr. 775, 781–782 (Ct.App.1972); *First Western Bank & Trust Co. v. Bookasta*, 267 Cal.App.2d 910, 73 Cal.Rptr. 657, 660 (1969).

All these factors are present here. Zide himself testified that the corporation was undercapitalized. This testimony was confirmed by further evidence which established that although Healthwin consistently had outstanding liabilities in excess of $150,000, its initial capitalization was only $10,000. Moreover, Healthwin's financial statements showed that on December 31, 1971, at the end of three months of operation, the corporation had total liabilities of $167,861.21 but only $148,445.23 in total assets. By December 31, 1972, its current liabilities had grown to $246,398.20 while total assets had grown only to $180,448.87. By December 31, 1973, total liabilities were $350,283.14 in comparison to total assets of only $186,053.46. In 1974 and 1975 the liabilities of the corporation continued substantially to exceed its assets.

The evidence also established that Zide exercised his control over Healthwin so as to cause its finances to become inextricably intertwined with both his personal finances and his other business holdings. As noted earlier, Healthwin's health care facility was located in realty owned by a partnership in which Zide had a fifty percent interest. This partnership had made substantial loans to the corporation. The pattern of payments from Healthwin to the partnership and to Zide makes clear that neither payments to the partnership for use of the realty nor the repayment of the loans was handled in a regular arms length business fashion.

For example, Healthwin made no rental payments to the partnership for use of its real property but in lieu thereof made payments due on the partnership's mortgage directly to the partnership's mortgagees or to Zide personally. In this connection, until 1973 the books of the corporation treated the bulk of each such payment to the mortgagees as rent for use of the real property and applied the remaining portion of the payment against the partnership's loans to the corporation. During most of 1973 and all of 1974 the books of the corporation treated these mortgage payments in their entirety as repayments of loans from the partnership.

The mixing of Healthwin's finances with those of Zide and his partnership is reflected in other transactions as well. Thus, in 1972 Healthwin paid directly to the State the property taxes due on the partnership's real property while in 1973 Healthwin issued a check for these taxes directly to Zide.

Additionally, it is to be noted that Healthwin also leased its furniture and fixtures from the partnership. Again in lieu of rent, Healthwin made periodic payments on behalf of the partnership directly to the chattel mortgagee of the furniture and fixtures save for one occasion when the payment was made to Zide personally. These periodic payments ended on November 15, 1972 when Healthwin made a lump sum payment of $70,677.48 to the chattel mortgagee discharging the obligation of the partnership under that mortgage. This lump sum payment was credited against Healthwin's debt to the partnership.

The necessary conclusion from all this is that Zide handled Healthwin's finances so as to accommodate his own business interests. Treatment of corporate assets in this fashion has long been considered a significant factor supporting the piercing of the corporate veil. See, e. g., *Kagel v. First Commonwealth Co.*, 409 F.Supp. 1396, 1400 (N.D.Cal.1973), *aff'd*, 534 F.2d 194 (9th Cir. 1976); *Arnold v. Browne, supra*, 103 Cal. Rptr. at 781–782.

Another factor present here is that the operations of Healthwin were marked by an essential disregard of corporate formalities. See, e. g., *Minton v. Cavaney, supra,* 15 Cal.Rptr. at 643, 364 P.2d at 475. Thus board meetings were not regularly held and with the exception of the first board meeting Zide and his wife were the only directors or shareholders present.

■ There is the final consideration that the court should not pierce the corporation's veil unless necessary to prevent an inequitable result. *Matter of Christian & Porter Aluminum Co., supra,* 584 F.2d at 338; *McCombs v. Rudman, supra,* 17 Cal.Rptr. at 354; *Riddle v. Yosemite Creek Co.,* 322 P.2d 538, 540 (Dist.Ct.App.1958); *Shafford v. Otto Sales Company,* 149 Cal.App.2d 428, 308 P.2d 428, 431 (1957). As to this, it is not necessary that plaintiff prove actual fraud; it is enough if the failure to pierce the corporation's veil would result in an injustice. *Bariffi v. Longridge Development Company,* 156 Cal.App.2d 583, 320 P.2d 192, 199 (1958); *Gordon v. Aztec Brewing Co.,* 33 Cal.2d 514, 523, 203 P.2d 522, 527 (1949). Given the situation present here, the court must conclude that it would be unjust not to pierce the corporate veil. For one thing, Healthwin's undercapitalization subjected all its creditors, including plaintiff, to inequitable risks regarding Healthwin's obligations to them. *Minton v. Cavaney, supra,* 15 Cal.Rptr. at 643, 364 P.2d at 475; *Automotriz Del Golfo De California v. Resnick, supra,* 306 P.2d at 4; *Firt Western Bank & Trust Co. v. Bookasta, supra,* 73 Cal.Rptr. at 660; *Bariffi v. Longridge Development Company, supra,* 320 P.2d at 200. Further, the court finds it particularly inequitable that in 1974 Healthwin, though insolvent, paid back to the Zide partnership some $109,000 it had previously borrowed from the partnership leaving a balance due the partnership of only $164.06. What is more, the record indicates that during 1975 Healthwin repaid Zide at least $39,384 on loans he had made to it.

---

**3.** In view of this holding, it is unnecessary to reach plaintiff's alternative claim that Zide is

In view of the foregoing considerations, the court holds that Healthwin's corporate entity should be disregarded under the *alter ego* theory of liability.[3]

We turn last to Zide's claim that he is entitled to an offset because plaintiff allegedly owed money to Healthwin. Zide submitted no documentary evidence establishing the existence of such a debt or even indicating the amount supposedly owed. Also, Zide's testimony regarding the supposed debt was vague and contradictory. The court concludes, therefore, that Zide is not entitled to any offset.

For the reasons set forth above, the court holds that Zide is personally liable to plaintiff for the Medicare overpayments to Healthwin. Accordingly, judgment will be entered against defendants in the sum of $30,-481.55 plus interest at seven percent from the date of first demand on November 13, 1973.