Phyllis E. COLMAN, Plaintiff
and Respondent,

v.

William J. COLMAN, Defendant
and Appellant.

No. 860325–CA.

Court of Appeals of Utah.

Oct. 2, 1987.

Frank J. Allen, Salt Lake City, for defendant and appellant.

Bryce Roe, Albert Colton, Salt Lake City, for plaintiff and respondent.

Before BILLINGS, GARFF and JACKSON.

## OPINION

GARFF, Judge:

Defendant/appellant William J. Colman appeals from a property settlement judgment in favor of plaintiff/respondent Phyllis E. Colman stemming from their 1977 divorce. He seeks reversal of the judgment.

The parties were divorced after a twenty-four year childless marriage during which they acquired substantial property. On August 2, 1977, in anticipation of divorce, they executed a written property settlement agreement. Because questions had not been resolved as to which assets controlled by defendant were part of the marital estate, this agreement required him to provide plaintiff with a "complete accounting of all stocks currently owned by him or in which he [had] any interest," and a "complete accounting of all royalty interests currently owned by him or in which he [had] any interest" within one year of the agreement. Once the extent of defendant's holdings was determined, plaintiff was to receive one-half of defendant's interest in any stocks "held in ... [his] name or in which he [had] any interest," and one-half of the sales proceeds of the Anderson Ranch, jointly owned property located in Cache County, Utah.

Much of the dispute between the parties centered around defendant's relationship to Owanah Oil Corporation [Owanah], a closely held corporation which defendant and Francois de Gunsberg had founded in 1952 to engage in oil and gas exploration. Defendant had served as Owanah's president during much of the parties' marriage. In 1959, Owanah was restructured to generate outside capital. As a consequence, defendant and plaintiff held approximately

twenty percent of Owanah's outstanding shares.

At the time of the divorce, defendant also controlled stock, originally issued in various names, in other closely held corporations: Western Oil Shale Corporation, Cayman Corporation, and Royalty Investment Company. Defendant claimed that most of this stock belonged to Owanah, was not part of the marital estate, and, therefore, was not subject to the property division agreement.

The Western Oil Shale Company stock was issued in 1964 in consideration for Owanah's interest in several oil shale leases. Although defendant alleged that none of the parties' personal funds were expended to acquire these leases, he introduced no evidence beyond his testimony to that effect. He also explained that the stock was issued in names other than Owanah's so that Owanah could sell it more easily by avoiding normal corporate formalities. At the time of trial, he held at least 28,200 Western Oil Shale shares under his personal control, but admitted ownership of only 2,256 of them.

Cayman stock had been issued by Cayman Corporation as consideration for stock in another closely held corporation, National Oil Shale Corporation, and for an oil and gas lease with a producing oil well. Defendant testified that both the National Oil Shale and Cayman shares were issued in his name for ease in sale and handling, but that he held them in trust for third parties. However, he introduced no evidence other than his testimony that there was an actual trust relationship between himself and others. Part of the reason for his failure to introduce evidence was the lack of Cayman and National Oil Shale corporate records. At the time of trial, defendant held at least 48,000 shares of Cayman stock in his name.

At the time of the property settlement agreement, Royalty Investment Company owned, as its only major asset, the Anderson Ranch. At trial, defendant testified that Owanah and two other parties had made installment payments on the ranch and, thus, were entitled to 62½% of Royalty's outstanding stock. However, defend-

ant's earlier deposition contradicted this testimony, stating that he and plaintiff owned 62½% of the Royalty stock. Defendant, in his personal financial statements, valued the ranch at between $250,000 and $1,000,000.

In January 1982, Royalty sold the Anderson ranch for $250,000 and authorized Owanah to use the proceeds. The only consideration which Royalty received for the proceeds was its choice between an interest-bearing loan and a 4% overriding royalty interest in Owanah.

Defendant also claims that he made an oral accounting pursuant to the property settlement agreement with the law firm Roe and Fowler, and turned over to Roe and Fowler all stock certificates in the parties' safe deposit box. Because plaintiff was not satisfied that there had been an adequate accounting under the terms of the property settlement agreement, she finally brought this action on May 29, 1980, to compel the accounting and judgment for any damages caused by defendant's delay in submitting the accounting. The purpose of the accounting was to identify the amount to which plaintiff was entitled as her share of the marital estate.

The trial court agreed that defendant had not made an adequate accounting, finding that Owanah was defendant's alter ego even though this issue was not explicitly raised in the pleadings. The court also found that the assets subject to the accounting were, in fact, owned by defendant, and, pursuant to the terms of the settlement agreement, that plaintiff was entitled to one-half of those assets. However, because most of the assets had been sold by defendant, the court established a monetary value for the liquidated assets and included that amount as part of the marital estate to be distributed between the parties. Although this was an accounting action, the court appropriately disposed of the assets according to the terms of the stipulated property settlement agreement without objection by either party.

Defendant raises the following issues on appeal: (1) Was the alter ego issue properly before the trial court? (2) If the alter

ego issue was properly before the court, was there sufficient evidence to sustain the court's finding that Owanah was defendant's alter ego? (3) Does applying the alter ego doctrine effect a property distribution contrary to the parties' property distribution agreement? (4) Did the evidence, findings, and conclusions support the order requiring defendant to pay plaintiff an amount representing a percentage of the Anderson Ranch sale proceeds? (5) Is plaintiff estopped from denying that defendant furnished a satisfactory accounting?

## I

Under Rule 15(b) of the Utah Rules of Civil Procedure, issues not raised by the pleadings may be tried by the express or implied consent of the parties.[1] The Utah Supreme Court has observed that issues tried by express or implied consent shall be treated as if raised in the pleadings. Therefore, "even failure to amend the pleadings does not affect the result of the trial of these issues." *General Ins. Co. of Am. v. Carnicero Dynasty Corp.*, 545 P.2d 502, 506 (Utah 1976).

■ If a theory of recovery is fully tried by the parties, the court may base its decision on that theory and deem the pleadings amended, even if the theory was not originally pleaded or set forth in the pleadings or the pretrial order. *MBI Motor Co. v. Lotus/East, Inc.*, 506 F.2d 709, 711 (6th Cir.1974). However, that the issue has, in fact, been tried, and that this procedure has been authorized by express or implied consent of the parties must be evident from the record. *Wirtz v. F.M. Sloan, Inc.*, 285 F.Supp. 669, 675 (W.D.Pa.1968). "A trial court may not base its decision on an issue that was tried inadvertently." *MBI Motor Co.*, 506 F.2d at 711.

Implied consent to try an issue may be found "where one party raises an issue material to the other party's case or where evidence is introduced without objection," *General Ins. Co. of Am.*, 545 P.2d at 505–06, where it "appear[s] that the parties understood the evidence [was] to be aimed at the unpleaded issue." *MBI Motor Co.*, 506 F.2d at 711. *See First Security Bank of Utah v. Colonial Ford, Inc.*, 597 P.2d 859, 861 (Utah 1979).

Thus, the test for determining whether pleadings should be deemed amended under Utah R.Civ.P. 15(b) is "whether the opposing party had a fair opportunity to defend and whether it could offer additional evidence if the case were retried on a different theory." *R.A. Pohl Const. Co. v. Marshall*, 640 F.2d 266, 267 (10th Cir.1981). *See also Cheney v. Rucker*, 14 Utah 2d 205, 381 P.2d 86, 91 (1963); *Buehner Block Co. v. Glezos*, 6 Utah 2d 226, 310 P.2d 517, 519–20 (1957).

■ In the present case, even though the alter ego issue was not specifically raised in the pleadings, either initially or by amendment, the entire trial testimony concerned defendant's control over the assets in question. During trial, evidence concerning every element of the alter ego issue was introduced without objection. Further, the basic question raised in an alter ego case is whether the principal had personal control over assets which he claimed to belong to the corporation. Since this question is the essential issue presented by this accounting action, we find that the parties received adequate notice of the alter ego issue and an opportunity to meet it.

---

1. Utah R.Civ.P. 15(b) (1977) reads as follows: When issues not raised by the pleading are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits. The court shall grant a continuance, if necessary, to enable the objecting party to meet such evidence.

There was no indication in the record that defendant ever represented to the court that he was taken by surprise or was otherwise disadvantaged in meeting the alter ego issue. *See Cheney v. Rucker*, 381 P.2d at 91. We find, therefore, that the alter ego issue was properly before the court.

## II

▇ There is sufficient evidence to sustain the trial court's finding that Owanah was defendant's alter ego. "Ordinarily, a corporation is regarded as a separate and distinct legal entity from its stockholders." *Dockstader v. Walker*, 29 Utah 2d 370, 510 P.2d 526, 528 (1973). This is true whether the corporation has many stockholders or only one. *Ramsey v. Adams*, 4 Kan. App.2d 184, 603 P.2d 1025, 1027 (1979); *Kline v. Kline*, 104 Mich.App. 700, 305 N.W.2d 297, 298 (1981). Consequently, the corporate veil which protects stockholders from individual liability will only be pierced reluctantly and cautiously. *Ramsey v. Adams*, 603 P.2d at 1027; *William B. Roberts, Inc. v. McDrilling, Co.*, 579 S.W.2d 335, 345 (Tex.Civ.App.1979).

▇ To disregard the corporate entity under the equitable alter ego doctrine, two circumstances must be shown: (1) Such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, but the corporation is, instead, the alter ego of one or a few individuals; and (2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an inequity. *Norman v. Murray First Thrift & Loan Co.*, 596 P.2d 1028, 1030 (Utah 1979). *Accord United States v. Healthwin-Midtown Convalescent Hosp. and Rehabilitation Center, Inc.*, 511 F.Supp. 416 (C.D.Calif. 1981). *See also Centurian Corp. v. Fiberchem, Inc.*, 562 P.2d 1252, 1253 (Utah 1977); *Dockstader v. Walker*, 29 Utah 2d

370, 510 P.2d 526, 528 (1973); *Geary v. Cain*, 79 Utah 268, 9 P.2d 396, 398 (1932). It is not necessary that the plaintiff prove actual fraud, but must only show that failure to pierce the corporate veil would result in an injustice. *Healthwin-Midtown Convalescent Hosp.*, 511 F.Supp. at 420.

▇ Certain factors which are deemed significant, although not conclusive, in determining whether this test has been met include: (1) undercapitalization of a one-man corporation; (2) failure to observe corporate formalities;[2] (3) nonpayment of dividends; (4) siphoning of corporate funds by the dominant stockholder; (5) nonfunctioning of other officers or directors; (6) absence of corporate records; (7) the use of the corporation as a facade for operations of the dominant stockholder or stockholders;[3] and (8) the use of the corporate entity in promoting injustice or fraud. *Ramsey v. Adams*, 603 P.2d at 1028; *Amoco Chemicals Corp. v. Bach*, 222 Kan. 589, 567 P.2d 1337, 1341–42 (1977). *See also Ramirez v. United States*, 514 F.Supp. 759, 763–64 (D.Puerto Rico 1981); *Healthwin-Midtown Convalescent Hosp.*, 511 F.Supp. at 418–19; *Dillman v. Nobles*, 351 So.2d 210, 213–14 (La.App.1977).

▇ The rationale used by courts in permitting the corporate veil to be pierced is that if a principal shareholder or owner conducts his private and corporate business on an interchangeable or joint basis as if they were one, he is without standing to complain when an injured party does the same. *Bone Constr. Co. v. Lewis*, 148 Ga.App. 61, 250 S.E.2d 851, 853 (1978). In *Lyons v. Lyons*, 340 So.2d 450, 451 (Ala. Civ.App.1976), the court stated that "[a] court of equity looks through form to substance and has often disregarded the corporate form when it was fiction in fact and deed and was merely serving the personal use and convenience of the owner." The

---

2. Failure to observe corporate formalities includes such activities as commencement of business without the issuance of shares, lack of shareholders' or directors' meetings, lack of signing of consents, and the making of decisions by shareholders as if they were partners. *Roylex, Inc. v. Langson Bros. Constr. Co.*, 585 S.W.2d 768, 772 (Tex.Civ.App.1979).

3. Failure to distinguish between corporate and personal property, the use of corporate funds to pay personal expenses without proper accounting, and failure to maintain complete corporate and financial records are looked upon with extreme disfavor. *Roylex*, 585 S.W.2d at 772.

*Lyons* court found a corporation to be a shareholder's alter ego, even though he owned only one share of stock, because he commingled corporate funds with his own, kept no regular corporate records, meetings, or minutes aside from a bank account, and did not file corporate income tax returns. *See Standage v. Standage,* 147 Ariz.App. 473, 711 P.2d 612, 614–15 (1985).

Former spouses attempting to shield assets from a court-ordered property distribution by using a corporate form are especially looked upon with judicial disfavor. *See Standage v. Standage,* 147 Ariz. App. 473, 711 P.2d 612 (1985); *Colandrea v. Colandrea,* 401 A.2d 480 (Md.Ct.Spec. App.1979).

In the present case, the trial court considered the evidence in the light of this test, finding that Owanah was defendant's alter ego on the grounds that (1) "[t]here exists such a unity of ownership and interest between defendant and Owanah Oil Corporation that the separate personalities of the corporation and the individual no longer exist," and (2) to recognize such separate personalities "would promote injustice and an inequitable result."

For purposes of appellate review, the trial court's decision to pierce the corporate veil will be upheld if there is substantial evidence in favor of the judgment. *Standage,* 711 P.2d at 614–16. An examination of the present trial record indicates that there was substantial evidence supporting the trial court's finding that the separate personalities of Owanah and defendant no longer existed.

First, defendant ignored corporate formalities. He stated that he preferred to conduct corporate business personally, rather than in the corporate name, because it was more convenient than observing appropriate corporate procedures, and repeatedly did so.

Second, defendant failed to distinguish between corporate and personal property in his business dealings.

In correspondence with First Security Bank, defendant continually referred to the Owanah checking account as his personal account. Although he stated that this occurred because the bank initially preferred to deal personally with the principals because of Owanah's small net worth, he also continued this practice well after Owanah acquired substantial assets, because, as he stated, adjustments in loans and sales of stock could be made without time-consuming corporate resolutions.

On September 17, 1976, defendant pledged 50,820 shares of Western Oil Shale stock and 48,000 shares of Cayman stock to First Security Bank as collateral for loans to Owanah. He testified that this stock had originally been issued in his, his brother's, and his broker's names, rather than in Owanah's name, so that corporate formalities could be avoided in selling the stock. Between September 17, 1978, and February 23, 1979, he held as many as 93,298 shares of Western Oil Shale stock and 48,000 shares of Cayman stock in his personal bank and brokerage accounts. All transactions dealing with these shares were authorized by his signature without any suggestion that he was acting on behalf of anyone else.

First Security Bank released the 48,000 shares of Cayman stock and 47,820 shares of the Western Oil Shale stock to defendant on July 9, 1979. The bank recognized this stock as being defendant's personal property in that it required defendant to sign an indemnity agreement to protect the bank from any claim raised by plaintiff against the shares.

Defendant testified that this stock, valued by the trial court at $14.25 per share, was later sold to fund one of Owanah's projects, and that the proceeds from this sale were deposited in Owanah's account. However, payments for defendant's residential mortgage, light and utility bills were also made directly from Owanah's account, as were numerous cash payments to defendant, totalling $22,695.25 within a twelve month period. To help finance Owanah's activities, defendant also mortgaged the parties' Park City residence for $60,000, applied part of the proceeds to a reduction of Owanah's debt, and deposited the remainder in Owanah's account. Defend-

ant explains the mortgage payments made on his behalf by Owanah as repayment by Owanah of this mortgage. Further, defendant presented no evidence at trial that he maintained any personal checking account apart from Owanah's. Personal and corporate affairs appear to be inextricably interwoven.

Third, the other officers and directors played little, if any, role in the operation of defendant's corporate entities. Defendant produced no evidence at trial, other than his testimony, to indicate that others had any interest in Owanah, although the trial judge requested such evidence on several occasions during the trial and the trial was recessed for defendant to provide it.

Fourth, there was an almost complete failure to keep and maintain corporate records. There was no evidence that shareholder records were kept for Cayman Corporation, even though such records were repeatedly requested by plaintiff's counsel and the trial judge, and defendant was even given an opportunity by the court to find and present them. Defendant was similarly unable to produce any records which showed shareholders, bylaws, or financial status of Royalty Investment Corporation. Defendant claimed that Owanah owned Cayman stock as well as proceeds from the sale of the Anderson Ranch, which was owned by Royalty Investment Corporation.

Fifth, there is evidence that Owanah and the other corporate shells were used as a facade for defendant's personal business operations. The most significant evidence was the method in which the Anderson Ranch sale was consummated. After the property settlement agreement had been entered, Royalty Investment Corporation sold the ranch, using no corporate formalities, and then deposited the sale proceeds in Owanah's bank account for a 4% overriding royalty interest in the Owanah project. Plaintiff alleged that this was no consideration at all. Although the transaction was ratified by Royalty on the advice of counsel eleven months after the sale and three days before trial, such a ratification does not invest this transaction with legiti-

macy. Since defendant did not proffer testimony at trial of anyone other than himself, purporting to have an interest in Royalty, Owanah, or the Anderson Ranch, it is difficult to view this transaction as anything but a personal transaction done under a corporate aegis. Thus, defendant's equivocal testimony regarding the ownership of the Anderson Ranch, coupled with the lack of substantial evidence that Owanah gave valuable consideration for the proceeds of the Anderson Ranch sale, supports a finding that the corporate shells were used as a facade for the transfer of property from a corporate shell that plaintiff had some interest in to one in which she had less interest.

Further, defendant's use of Owanah to receive the proceeds from the sale of the Cayman and Western Oil Company stock, coupled with his use of Owanah's account to pay his personal living expenses, suggest that defendant was using Owanah as a facade for his personal affairs.

Finally, the use of the corporate entity in this circumstance would result in injustice. If viewed as legitimate corporate transactions, plaintiff's post-settlement agreement business transactions would convert substantial assets, which otherwise would be regarded as marital property, to corporate assets in which plaintiff had no interest. Such shielding of assets would result in a great injustice to plaintiff.

Therefore, we find that there was substantial evidence before the trial court to support its finding that defendant's corporations were actually his alter ego.

### III

Because application of the alter ego doctrine is justified, we reach the issue of whether the property division by the trial court is in harmony with the parties' property settlement agreement. Defendant argues that the property division resulting from the alter ego finding is contrary to the intent of the property settlement agreement because it awards plaintiff more than half of the marital estate, and, thus, is an abuse of judicial discretion.

In the division of marital property, the trial court has wide discretion, and, while the appellate court is not necessarily bound by its findings, *Thompson v. Thompson,* 709 P.2d 360, 361–62 (Utah 1985), the findings are presumed valid and will not be disturbed unless the record indicates such a manifest injustice or inequity as to indicate a clear abuse of discretion. *Eames v. Eames,* 735 P.2d 395, 397 (Utah Ct.App.1987); *Petersen v. Petersen,* 737 P.2d 237, 239 (Utah Ct.App.1987). Regarding challenges to property distributions, the Utah Supreme Court has stated that:

> a party seeking reversal of the trial court must prove a misunderstanding or misapplication of the law resulting in substantial and prejudicial error, or that the evidence clearly preponderated against the findings, or that such a serious inequity resulted from the order as to constitute an abuse of the trial court's discretion.

*McCrary v. McCrary,* 599 P.2d 1248, 1250 (Utah 1979). That the property distribution may not have been mathematically equal is not sufficient grounds to constitute an abuse of discretion, since a fair and equitable property distribution is not necessarily an equal distribution. *See Fletcher v. Fletcher,* 615 P.2d 1218, 1223–24 (Utah 1980).

Further, it is well recognized that a parties' stipulation as to property rights in a divorce action, although advisory and usually followed unless the court finds it to be unfair or unreasonable, is not necessarily binding on the trial court. It is only a recommendation to be adhered to if the court believes it to be fair and reasonable. *Pearson v. Pearson,* 561 P.2d 1080, 1082 (Utah 1977); *Klein v. Klein,* 544 P.2d 472, 476 (Utah 1975). Thus, even if the trial court does not exactly follow the parties' agreement, such a decree is still within the trial court's reasonable discretion.

The Utah Supreme Court has previously upheld a trial court's property division under somewhat similar circumstances. In *Pusey v. Pusey,* 728 P.2d 117 (Utah 1986), the defendant husband appealed from the portion of a divorce decree awarding the plaintiff wife one-half of the value of a corporation formed during their marriage. He alleged that a corporation which the trial court had determined to be his personal, premarital property had loaned $69,000 to a corporation which he and his wife formed during the marriage. Because he "utterly failed to prove that the loan did indeed exist," in that he could produce no papers documenting the loan, any terms, conditions of repayment, or interest, and because the trial court expressly found that he had commingled corporate and personal funds throughout the marriage so that it could not trace any assets to any source, the court found that he had failed to carry his burden of proof. *Id.* at 119.

Similarly, the present defendant has failed to carry his burden of proof that the disputed assets are corporate rather than personal property, so we find no abuse of discretion in the trial court's property division resulting from application of the alter ego theory.

## IV

Defendant further argues that the trial court's order requiring him to pay plaintiff an amount representing a percentage of the price of the Anderson Ranch sale proceeds is without support in the findings, conclusions, or evidence. We reiterate that the trial judge has wide discretion in the division of marital property, and his findings will not be disturbed by an appellate court unless the record shows a clear abuse of discretion. The Utah Supreme Court has stated, in *Pearson v. Pearson,* 561 P.2d at 1082, that:

> in regard to the matter of the sufficiency of findings of fact, a substantial compliance with Rule 52, Utah Rules of Civil Procedure, is sufficient, and findings of fact and conclusions of law will support a judgment, though they are very general, where they in most respects follow the allegation of the pleadings. Findings should be limited to the ultimate facts and if they ascertain ultimate facts, and sufficiently conform to the pleadings and the evidence to support the judgment, they will be regarded as sufficient,

though not as full and as complete as might be desired.

However, "to determine if equity was done, we must have before us specific findings of fact pertinent to that issue." *Jones v. Jones*, 700 P.2d 1072, 1074 (Utah 1985); *Boyle v. Boyle*, 735 P.2d 669, 671 (Utah Ct.App.1987).

■ In the present case, the trial court specifically found that "[a]t the time of the parties' agreement, and until the property was sold in January 1982, defendant held title to 62½% interest in the ranch through Royalty Investment Company. The ranch was sold for $250,000.00 in January 1982, and the accounting shows that defendant is indebted to plaintiff in the amount of $78,-125.00, which is 31.25% of $250,000.00." It is the trial judge's prerogative, not an abuse of discretion, to choose to disbelieve defendant's explanation of this property interest. There was evidence in the record to support such a finding, which is sufficient to come within the guidelines outlined by *Pearson* and *Jones*.

Therefore, we affirm the trial court's award with respect to the Anderson Ranch property.

## V

Defendant's final issue raised on appeal is whether plaintiff was estopped from denying that he furnished an adequate accounting. He alleges that he made an oral accounting to the law firm of Roe and Fowler and turned over to Roe and Fowler all the stock certificates in the parties' safe deposit box. Roe and Fowler later returned some of these certificates to defendant. Defendant argues that he acted in reasonable reliance upon express or implied representations that the accounting was satisfactory because defendant made no further demand for an accounting after this event. However, the document which defendant received from Roe and Fowler when it returned the certificates was only an acknowledgement that the shares were delivered into his control as president of Owanah, rather than a release or exclusion of the shares from an eventual accounting. Further, plaintiff alleges that she was in

continual contact with defendant concerning his failure to make the accounting and had brought a prior lawsuit against defendant to enforce the divorce decree and agreement. Finally, plaintiff stated that she was totally without knowledge of the business affairs concerning the disputed assets.

■ Estoppel arises when there is (1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of the facts; (3) made to a party who is without knowledge or the means of knowledge of the real facts; (4) made with the intention that the representation be acted upon; and (5) the party to whom the representation was made relied or acted upon it to his prejudice. *Kelly v. Richards*, 95 Utah 560, 83 P.2d 731, 734 (1938); *Morgan v. Board of State Lands*, 549 P.2d 695, 697 (Utah 1976). *See also City of Mercer Island v. Steinmann*, 9 Wash.App. 479, 513 P.2d 80, 82 (1973). If any of these elements are missing, there can be no estoppel. *Kelly v. Richards*, 83 P.2d at 734. Further, estoppel cannot be inferred from facts of which the party to be estopped had no knowledge. *Grover v. Garn*, 23 Utah 2d 441, 464 P.2d 598, 602 (1970).

■ Estoppel is not applicable under the present facts.

The judgment of the trial court is affirmed. Costs to plaintiff.

BILLINGS and JACKSON, JJ., concur.