**Herman HERTZ, as Trustee for the Sherry Trust, a California trust, and Cal Fund Ltd., a California unincorporated association, Plaintiffs and Appellants,**

v.

**NORDIC LIMITED, INC., a Utah corporation, Defendant and Respondent.**

No. 880086–CA.

Court of Appeals of Utah.

Sept. 28, 1988.

David R. King, Kruse, Landa & Maycock, Salt Lake City, for plaintiffs and appellants.

Keith Biesinger, Salt Lake City, for defendant and respondent.

Before DAVIDSON, BILLINGS and GREENWOOD, JJ.

## OPINION

DAVIDSON, Judge:

The series of transactions leading to this lawsuit concern oil and gas leases in Casey and Adair Counties, Kentucky. The ownership of these leases was disputed in a federal court suit in which Jader, Inc. (Jader), a subsidiary of Nordic Limited, Inc. (Nordic), was a party. One of the central issues in that suit concerned the actions of Seymore L. Hertz (Hertz), a California businessman who possessed an interest in the leases. The settlement of the federal litigation enabled Hertz to enter in the agreements at issue herein.

A memorandum of understanding (first agreement) was signed on June 29, 1982. The parties were Hertz, as an individual, Cal Fund Ltd. (in which Hertz was the general partner and manager), Jader, and Nordic. The first agreement assigned all right, title, and interest of Hertz and Cal Fund Ltd. in the Kentucky oil and gas leases to Nordic and Jader. Important sections state:

1. For and in consideration of Hertz executing the above described Assignment of Interest ... Nordic agrees to issue to Cal Fund Ltd. Two Hundred Thousand (200,000) shares of Nordic Limited, Inc., investment stock, which shares shall be issued from the authorized, but unissued capital of Nordic Limited, Inc.; Nordic further agrees to transfer to Seymore L. Hertz the sum of Two Hundred Seventeen Thousand (217,000) shares of Nordic Limited, Inc. investment stock....

2. The parties hereto agree that the 200,000 shares of Nordic Limited, Inc. to be issued to Cal Fund Ltd. shall be placed in escrow for a period not to exceed six (6) months. In the event the market value of said shares is less than $400,000.00 at the expiration of the six month period, Nordic agrees to issue additional shares to Cal Fund Ltd. to equal $400,000.00 (market value defined as the average bid/ask price of the securities during the five trading days prior to the expiration of the six month period.[) ] Cal Fund Ltd. may at its option remove the 200,000 shares of Nordic Limited, Inc. from escrow as full payment herein.

A second agreement was also executed on June 29, 1982. The parties were Sherry Trust, managed by Seymore Hertz for the benefit of his wife and children, and Nordic. Under this agreement, Nordic was to pay Sherry Trust $75,000.00 as a finder's fee for the latter's role in the first agreement; $25,000.00 to be paid at the time of closing on the first agreement. The second agreement further provided:

2. The balance of $50,000 shall be paid as follows:

a. Nordic shall instruct South Kentucky Purchasing to pay to Sherry Trust 25% of the net proceeds received by Jader or Nordic from oil sold in Casey and/or Adair County, Kentucky, until such time as Sherry Trust has received a total of $50,000.00. Said payments shall commence 60 days from the date of closing of the subject Memorandum of Understanding [first agreement], which closing is set for July 15, 1982.

The balance owed to Sherry Trust was later modified to $58,500.00.

Seymore Hertz testified he met David Ross (Ross), an attorney who was legal counsel for Nordic and later Nordic's president, on June 29, 1982. The meeting took place when the two agreements were executed in Salt Lake City. Hertz stated Ross told him to "just hold onto" the Nordic stock certificates when they came to Hertz and that he wasn't to "do anything with them." Ross denied having this conversation.

On July 29, 1982, Rodney M. Sweet (Sweet), attorney for Cal Fund Ltd., wrote to John E. Worthen (Worthen), controlling shareholder of Nordic. The letter stated:

You are requested to deliver to me by Monday, August 9, 1982, to hold until such time as the papers are filed with the court and the settlement consummated [the litigation concerning the oil and gas leases in the United States District Court for the Western District of Kentucky], the following items:

6. Certificate for 200,000 shares of Nordic Limited, Inc. Investment issued to Cal Fund Limited. (My documents do not indicate whether or not there is still a requirement that these shares be placed in escrow for a period of not to exceed six months, and I would appreciate further instructions from you as to this.)

The letter continued:

Mr. Hertz will be leaving the State of California for an extended period on Tuesday, August 10, 1982 and he requires that you deliver the above items to me to be held in trust so that I can distribute them immediately upon receipt of notice that the order has been entered in Kentucky.

Although there appears to be no written response to Sweet's request, on August 10, 1982, Nordic issued 200,000 shares of stock in the name of Cal Fund Ltd. and mailed them directly to Hertz. On November 15, 1982, Nordic sent Hertz/Cal Fund Ltd. a mailgram which stated "This is to verify that the Cal Fund shares for their interest in the Jader Kentucky properties were issued on August 10, 1982 and placed in escrow."

At this point the case evolves into two claims. Concerning the first, Hertz claimed Nordic agreed to provide additional shares subsequent to the six month escrow period when the market value of the 200,000 shares fell below the $400,000.00 amount set forth in the first agreement. However, Nordic, in a letter to Hertz on August 30, 1983, claimed Hertz had accepted the 200,000 shares prior to the expiration of the six month escrow period, and therefore, had no further claim for additional shares.

Concerning the second agreement, Nordic entered into an agreement to sell oil and gas produced from its Kentucky leases, earning $18,500.00, but these proceeds were not paid to Nordic. Subsequently, most of the leases were lost by abandonment or default because the properties were not "economically feasible" to keep in production. Nordic admitted that Sherry Trust was entitled to 25% of the $18,500.00 production revenue.

Trial was held on November 18 and 21, 1985. The trial court concluded the acceptance of the 200,000 shares by Hertz for Cal Fund Ltd. and the failure of either party to establish an escrow constituted full performance by Nordic under the first agreement. Under the second agreement, the court concluded that Sherry Trust was entitled to $4,625.00, representing 25% of the production proceeds.

Hertz presents the following issues for review: (1) did the trial court err in not finding Nordic's act of sending 200,000 of its shares to Hertz constituted a waiver of the escrow provision of the first agreement; (2) did the trial court err in not finding Nordic was estopped from denying Hertz was its properly appointed escrow agent under the first agreement based on Nordic's act of sending the shares to Hertz; (3) did the trial court err in not finding that Cal Fund Ltd. was entitled to additional Nordic shares pursuant to the first agreement; (4) did the trial court err in not finding that Nordic's abandonment of certain of the Kentucky oil and gas leases made its performance under the second agreement impossible and constituted a breach of that agreement; and (5) did the trial court err in not finding that Sherry Trust was entitled to the entire $58,500.00 owed under the second agreement as modified?

## THE FIRST AGREEMENT

The trial court found that "no escrow was in fact set up or implemented by either of the parties" and concluded that an escrow had not been established as contemplated by the first agreement. Restatement (Second) of Agency § 14D (1958) states that "[a]n escrow holder is not as such an agent of either party to the transaction until the event occurs which terminates the escrow relation." In the comment concerning the nature of escrow, the section states:

Ordinarily an escrow holder receives a deed or property from one person to be exchanged for the cash or other property

of another person upon the happening of a specified event. Because of the agreement, such persons do not respond to the will of either of the parties until the specified event or period of time. Before this, he has power to deal with the subject matter in accordance with the agreement of those for whom he holds it, and this power cannot be terminated without the consent of both.

*Id.* at comment a. We also note that "[i]t is well established that an escrow agent assumes the role of the agent of both parties to the transaction, and as such, a fiduciary is held to a high standard of care in dealing with its principals." *Freegard v. First Western Nat'l Bank,* 738 P.2d 614, 616 (Utah 1987) (footnote omitted). In *King v. First Nat'l Bank of Fairbanks,* 647 P.2d 596, 599 (Alaska 1982), the Alaska Supreme Court considered an escrow theory and wrote:

An escrow can be defined as a written instrument, which by its terms imports a legal obligation, deposited by the grantor, promisor or obligor *with a stranger or third person,* to be kept by this person until performance of a condition or happening of a certain event, and then to be delivered over to the grantee, promisee or obligee to take effect (emphasis added).

█ The mailing of the 200,000 shares directly to Hertz and his retention of them negates the "stranger or third person" aspect of an escrow. Hertz cannot be said to be a neutral party or a fiduciary as to Nordic.

█ Hertz claims that Nordic's sending him the stock constituted a waiver of the escrow provision. The Utah Supreme Court discussed waiver in *American Savings & Loan Ass'n v. Blomquist,* 21 Utah 2d 289, 445 P.2d 1 (1968), where it wrote:

A waiver is the intentional relinquishment of a known right. To constitute a waiver, there must be an existing right, benefit, or advantage, a knowledge of its existence, and an intention to relinquish it. It must be distinctly made, although it may be express or implied.

*Id.* 445 P.2d at 3 (footnote omitted). There is nothing to indicate that Nordic intentionally relinquished a known right in the escrow provision of the first agreement. Neither can waiver be implied by the November 15, 1982 mailgram to Hertz.

Hertz then argues that Nordic is estopped from denying he was the properly appointed escrow agent. "The elements of equitable estoppel are: 'conduct by one party which leads another party, in reliance thereon, to adopt a course of action resulting in detriment or damage if the first party is permitted to repudiate his conduct.'" *Blackhurst v. Transamerica Ins. Co.,* 699 P.2d 688, 691 (Utah 1985) (quoting *United American Life Ins. Co. v. Zions First Nat'l Bank,* 641 P.2d 158, 161 (Utah 1982)). In *Colman v. Colman,* 743 P.2d 782 (Utah App.1987), this court stated that estoppel arises when there is:

(1) a false representation or concealment of material facts; (2) made with knowledge, actual or constructive, of the facts; (3) made to a party who is without knowledge or the means of knowledge of the real facts; (4) made with the intention that the representation be acted upon; and (5) the party to whom the representation was made relied or acted upon it to his prejudice.

*Id.* at 790.

█ The facts in this case do not support an estoppel theory. There is no evidence to indicate that Nordic was attempting to make any misrepresentations to Hertz when it sent the shares to him. There can be no claim that Hertz was not aware of what had transpired or that he was not aware of the provisions of the first agreement. The trial court must have given little credence to Hertz' assertion that Ross told him to "just hold onto" the stock and that he was not to "do anything with them."

█ It appears that Hertz was desirous of gaining control of the Nordic shares. One month after the two agreements were signed, Cal Fund Ltd.'s attorney, Sweet, wrote Worthen and requested the 200,000 shares be sent to him prior to Hertz leaving California on August 10, 1982. Al-

though Sweet requested further information concerning the escrow provisions, his letter indicated Hertz was anxious to "distribute them immediately upon receipt of notice that the order has been entered in Kentucky." This gives rise to the conclusion that Hertz did not intend to wait until the end of the six month escrow period and that he would accept the stock as full payment pursuant to the first agreement. In view of the contradictory testimony and the preceding discussion, we hold the trial court ruling was not clearly erroneous when it found that no escrow had been established. There is no merit to the claim by Hertz for additional Nordic shares.

## THE SECOND AGREEMENT

The modified second agreement required Nordic to pay Sherry Trust 25% of the net proceeds from the Kentucky leases until Sherry Trust received a total of $58,500.00. The findings of fact state that Nordic earned $18,500.00 from the leases after November 1, 1982. The findings also reveal Nordic abandoned all but two of the leases obtained from Hertz because they were "either uneconomical to place into production or unproductive." The trial court concluded that Sherry Trust was entitled to 25% of the "production revenue or an amount of $4,625.00."

■ As stated by the court in *Cannon v. Stevens School of Business, Inc.*, 560 P.2d 1383 (Utah 1977):

A person cannot avoid liability for the non-performance [sic] of its obligation by placing such performance beyond his control by his own voluntary act. Furthermore, no one can avail himself of the non-performance of a condition precedent, who has himself occasioned its nonperformance.

*Id.* at 1385 (footnotes omitted). Hertz asserts that Nordic's default/abandonment of the majority of the leases occasioned its nonperformance under the second agreement. The findings show that Nordic's decision concerning the leases was based on economics. We are not convinced otherwise.[1] However, the findings and the transcript indicate that at least two of the leases continued in production. If additional production has been obtained, then Sherry Trust is entitled to the share described in the second agreement up to the modified limit. If the leases have been sold, Sherry Trust should receive the entire balance then due pursuant to the second agreement, if the sale provides sufficient funds.

The judgment of the trial court is affirmed in part and remanded for additional findings of fact and other appropriate action in accordance with this opinion. Pursuant to R. Utah Ct.App. 34(a), each party will bear its own costs on appeal.

BILLINGS and GREENWOOD, JJ., concur.

1. The court is very much aware of the calamitous fall in oil prices and the subsequent collapse of the oil industry in this country, and is aware that the fall began in the latter half of 1982.