**ENVIROTECH CORPORATION, a Delaware corporation d/b/a Eimco Process Equipment Company, Plaintiff, Appellee, and Cross–Appellant,**

v.

**Gerald A. CALLAHAN, an individual; Glen O. Hansen, an individual; and G & G Steel Corporation, a Utah corporation, Defendants, Appellant, and Cross–Appellee,**

**C–H Industries, Inc., Intervenor.**

No. 920645–CA.

Court of Appeals of Utah.

April 1, 1994.

George K. Fadel (argued), Bountiful, for appellant.

Thomas J. Rossa (argued), E. Russell Tarleton, A. John Pate, Trask, Britt & Rossa, and David T. Berry, Salt Lake City, for appellee.

William G. Fowler (argued), James D. Gilson, Van Cott, Bagley, Corwall & McCarthy, Salt Lake City, for intervenor C–H Industries, Inc.

Before BENCH, JACKSON and DAVIS, JJ.

## OPINION

BENCH, Judge:

Gerald A. Callahan appeals from various rulings of the trial court regarding his misappropriation and use of trade secrets belonging to Envirotech Corporation (EIMCO). We affirm. Callahan also appeals from the trial court's judgment holding him in contempt of court for violating a preliminary injunction. We affirm. EIMCO cross-appeals from the trial court's denial of its request to enjoin Callahan from directly competing with it for up to five years. We affirm. C–H Industries, Inc. (C–H) requests permission to intervene for the first time on appeal. We deny C–H's request.

## FACTS

EIMCO designs and manufactures large industrial filters. Each filter is custom designed according to each customer's needs.

In order to design and manufacture custom filters, EIMCO maintains a large team of engineers and designers who produce a unique set of drawings for each filter manufactured. EIMCO expends significant resources to maintain the confidentiality of its drawings and to prevent the drawings from falling into the hands of its competitors.

In 1959, Callahan began working for EIMCO. Callahan worked his way up to Manager of EIMCO's Extractor Unit Shop. He was responsible for the design, manufacture, marketing, and some selling of filters and other equipment. He was later promoted to District Manager and then to Assistant Regional Sales Manager. While Sales Manager, Callahan developed a successful marketing program for spare and repair parts for EIMCO filters. In 1980, Callahan retired from EIMCO.

In 1968, defendant, Glen O. Hansen, began working for EIMCO. By 1976, he had worked his way up to the position of Manager of Manufacturing Services in EIMCO's Extractor Unit Shop. He supervised the production of certain types of EIMCO filters. While in this position, he visited customers and became familiar with many installations. He also had contact with vendors who sold parts and services to EIMCO. In 1982, Hansen left EIMCO as a result of a reduction in work force.

All EIMCO employees, including Callahan and Hansen, were required to complete and sign employment applications. Each application contained a confidentiality agreement that obligated the employee not to divulge EIMCO confidential or proprietary information to the detriment of EIMCO. The agreement also provided that, at termination, employees were to return to EIMCO any such material they may have had in their possession or later obtained.

In October 1982, after Callahan and Hansen had left EIMCO's employ, they formed G & G Steel Corporation to sell replacement parts for EIMCO filters. Callahan and Hansen procured EIMCO drawings from EIMCO vendors and other EIMCO employees. The drawings were taken to G & G Steel where they were redrawn onto G & G Steel title-block drawing paper. As a result of this copying procedure, G & G Steel saved considerable time and money in making parts for EIMCO machines. In order to compete directly with EIMCO, G & G Steel used EIMCO's confidential customer lists that Callahan had retained.

Soon after the formation of G & G Steel, EIMCO became aware that G & G Steel intended to compete directly with EIMCO for the production of spare parts for EIMCO machines. EIMCO was not immediately aware, however, that G & G Steel possessed EIMCO drawings and customer lists. When G & G Steel began taking orders for parts that could only have been reasonably produced using confidential EIMCO drawings, EIMCO initiated an investigation. At the completion of the investigation, EIMCO brought this action to recover its drawings and to obtain other relief.

Upon filing its complaint, EIMCO moved the court ex parte for three writs of replevin and a writ of assistance to recover EIMCO property from Callahan, Hansen, and G & G Steel. The trial court granted the writs. Pursuant to the writs, a constable searched the homes of Callahan and Hansen and the premises of G & G Steel. The constable did not recover any evidence from the personal residences, but did recover significant evidence from G & G Steel.

EIMCO brought five causes of action against Callahan, Hansen, and G & G Steel: (1) replevin; (2) misappropriation of trade secrets; (3) breach of fiduciary duty; (4) interference with contract; and (5) conspiracy. Following a bench trial in 1989, the trial court ruled in favor of EIMCO on each of its causes of action. On November 7, 1989 the trial court awarded EIMCO $1,039,220 in general damages, $45,000 in punitive damages, prejudgment and postjudgment interest, and costs. That same day the court also granted permanent injunctive relief against further use of EIMCO property, and ordered Callahan to turn over to EIMCO all G & G Steel drawings and other misappropriated information. As a result of a stay resulting from a bankruptcy proceeding filed by G & G Steel, the court did not enter its written

findings of fact and conclusions of law until March 1991.

One week after the court issued its oral ruling and granted substantial injunctive relief to EIMCO, the parties appeared before the court and EIMCO requested the court to enjoin Callahan from doing certain things that would circumvent the court's oral ruling. The court granted EIMCO's request and the order was reduced to writing.[1] The written order enjoined Callahan from disposing of any of his or G & G Steel's property that was the subject of this action until entry of final judgment. The order also enjoined Callahan from:

> Making, using, shipping or selling any part, article, tool, mandrel, mold, form, casting, tooling, subassembly, component, assembly or item made in whole or in part, for any machine made or sold by [EIMCO] from any existing G & G detail drawing unless and except it has been shown by [Callahan] by a preponderance of the evidence already of record and admitted at the trial heretofore ... that a particular existing G & G detail drawing was in fact made other than by reference to an EIMCO detail drawing.

The court slightly modified and reissued this order in April 1990.

After the trial court issued its preliminary injunction, Callahan, his wife Ione Callahan, Hansen, and his wife Joan Hansen formed G & G Products, Inc., a Utah corporation.[2] G & G Products was formed to succeed to the business of G & G Steel. G & G Products operated for only a few weeks at which time C–H was formed to succeed to the business of G & G Products. Mrs. Callahan was the sole shareholder and president of C–H. Callahan and Mrs. Callahan were the initial directors of C –H. C–H took over most of the uncompleted contracts of G & G Steel, and over eighty percent of C–H customers were formerly customers of G & G Steel. The business of G & G Steel was transferred to C–H with no compensation to G & G Steel.

EIMCO brought contempt proceedings against Callahan, arguing that he violated the trial court's preliminary injunction by creating C–H and transferring G & G Steel assets and business to G & G Products and then to C–H. The trial court found that C–H was formed for the purpose of avoiding orders and judgments of the court. The trial court concluded that Callahan "obviated and circumvented" the court's preliminary injunction by creating first G & G Products and then C–H, and by transferring the business of G & G Steel through G & G Products to C–H. The court also found Callahan had misled the court in earlier testimony as to his earnings and assets. The court therefore held Callahan in contempt of court under Utah Code Ann. § 78–32–1(4) and (5) (1992), and ordered him to pay to EIMCO $5,000, plus EIMCO's costs and attorney fees associated with the contempt proceedings under Utah Code Ann. § 78–32–11 (1992). The court further ordered Callahan to transfer to EIMCO all the assets of C–H.

Callahan appeals from the trial court's orders in both the main case and in the contempt proceedings. EIMCO cross-appeals the trial court's refusal to enjoin Callahan from, in any way, contacting EIMCO customers or selling parts for EIMCO machines for a period of up to five years. C–H appeals as an intervenor, arguing in part that the trial court lacked jurisdiction to order Callahan to transfer its property to EIMCO.

## ISSUES

In his appeal, Callahan contends the trial court erred: (1) by issuing writs of replevin and assistance in order to secure the return of property in his possession, and by not suppressing evidence obtained pursuant to

---

1. Both the parties and the trial court refer to this order as a temporary restraining order governed by rule 65A(b) of the Utah Rules of Civil Procedure in force at the time of trial. However, the order was issued after trial but before entry of a final written order to prevent Callahan from frustrating the purpose and intent of the trial court's final judgment. As such, it is more appropriately designated a preliminary injunction governed by

rule 65A(a) and (e) of the Utah Rules of Civil Procedure. *See, e.g., Watkiss & Campbell v. Foa & Son*, 808 P.2d 1061, 1064–65 (Utah 1991) (title on motion or order not dispositive of content).

2. Mrs. Callahan and Mrs. Hansen were never parties to this action. Mr. Hansen was a party below, but is not a party to this appeal.

the writs; (2) by not ruling that the statute of limitations barred EIMCO's claims; (3) by determining that EIMCO drawings constituted trade secrets; and (4) by determining that Callahan owed EIMCO a fiduciary duty, which he breached.

Callahan also appeals from the trial court's contempt order, urging that the trial court erred: (1) by not complying with Rule 65A of the Utah Rules of Civil Procedure when issuing the preliminary injunction; (2) by holding him in contempt for participating in a newly formed company created to serve customers that G & G Steel could not serve as a result of the trial court's preliminary injunction; (3) by ruling that C–H was his alter ego; and (4) by ordering him to pay to EIMCO $5,000, and costs and attorney fees associated with the contempt proceedings.

EIMCO cross-appeals arguing that the trial court abused its discretion: (1) in failing to enjoin Callahan from making or selling EIMCO parts for a period of up to five years; and (2) in failing to enjoin Callahan from contacting EIMCO customers for a period of up to five years.

C–H attempts to join the appeal as an intervenor, urging that: (1) the judgments and writs are void as against C–H for lack of jurisdiction and violation of due process; and (2) the trial court erred in ruling that C–H was Callahan's alter ego.

## CALLAHAN'S APPEAL FROM MAIN CASE

### Writs of Replevin and Writ of Assistance

Callahan argues that the evidence seized from G & G Steel pursuant to the writs of replevin and the writ of assistance is inadmissible. Callahan asserts that the writs denied him his constitutional right of due process.

Three writs of replevin were issued in this case—one to search Callahan's home, one to search Hansen's home, and one to search the premises of G & G Steel. No evidence was found in either home. The search of G & G Steel revealed significant evidence that was later introduced at trial. G & G Steel is not a party on appeal.

Generally, before a defendant has standing to challenge the admission of evidence seized in a search, he or she must demonstrate some right of ownership or possession of the premises searched or the items seized. *See State v. Larocco*, 794 P.2d 460, 463–64 (Utah 1990); *State v. Constantino*, 732 P.2d 125, 126–27 (Utah 1987). A possessory or ownership interest is usually demonstrated by showing that the defendant had a subjective expectation of privacy in the premises searched or items seized, and that society is willing to recognize defendant's subjective expectation of privacy as legitimate. *See, e.g., State v. Taylor*, 818 P.2d 561, 565 (Utah App.1991). In the present case, Callahan has not argued that he had a personal possessory or ownership interest in G & G Steel's premises or the evidence seized. Therefore, Callahan has not demonstrated that he, individually, has standing to challenge the admission of the evidence seized from G & G Steel pursuant to the writ of replevin.

### Statute of Limitations

Callahan argues that all of EIMCO's causes of action are barred by a three-year statute of limitations. *See* Utah Code Ann. § 78–12–26(2) (1992). Specifically, he argues that EIMCO's causes of action accrued the moment he misappropriated confidential information or trade secrets. He asserts that he had misappropriated most of the confidential information and trade secrets prior to 1985. Therefore, he claims that when this action was commenced in 1988, the three-year statute of limitations had run and EIMCO's claims are therefore barred.

Section 78–12–26(2) provides that a plaintiff must bring an action within three years of the "taking, detaining, or injuring personal property, including actions for specific recovery thereof." *Id.* However, in three situations, Utah courts have held that the statute of limitations is tolled "until the discovery of facts forming the basis for the cause of action." *Myers v. McDonald*, 635 P.2d 84, 86 (Utah 1981); *accord Warren v. Provo City Corp.*, 838 P.2d 1125, 1129 (Utah 1992); *O'Neal v. Division of Family Servs.*, 821

P.2d 1139, 1143 (Utah 1991). Those situations are:

> (1) ... where the discovery rule is mandated by statute; (2) ... where a plaintiff does not become aware of the cause of action because of the defendant's concealment or misleading conduct; and (3) ... where the case presents exceptional circumstances and the application of the general rule would be irrational or unjust, regardless of any showing that the defendant has prevented the discovery of the cause of action.

*Warren,* 838 P.2d at 1129 (footnotes omitted); *accord O'Neal,* 821 P.2d at 1143.

■ Because section 78–12–26(2) does not specifically delay the accrual of this cause of action, only the concealment and exceptional circumstances versions of the discovery rule could apply in this case. Under the concealment version of the discovery rule, a defendant who misleads a plaintiff or "causes a delay in the bringing of a cause of action is estopped from relying on the statute of limitations as a defense to the action." *Warren,* 838 P.2d at 1130. The plaintiff must be able to demonstrate that he or she acted reasonably in not bringing the action during the limitations period. *Id.*

■ In the present case, the trial court found that "[t]he plaintiff did not know and could not have reasonably known that defendants Callahan and Hansen as well as defendant G & G Steel obtained and were using EIMCO confidential and proprietary information and other EIMCO property until late 1987." To successfully challenge the trial court's findings of fact, "[a]n appellant must marshal the evidence in support of the findings and then demonstrate that despite this evidence, the trial court's findings are so lacking in support as to be 'again the clear weight of the evidence,' thus making them 'clearly erroneous.'" *Ohline Corp. v. Granite Mill,* 849 P.2d 602, 604 (Utah App.1993) (quoting *In re Estate of Bartell,* 776 P.2d 885, 886 (Utah 1989)). "If the appellant fails to marshal the evidence, the appellate court assumes that the record supports the findings of the trial court and proceeds to a review of the accuracy of the lower court's conclusions of law and the application of that law in the case." *Id.* (quoting *Saunders v. Sharp,* 806 P.2d 198, 199 (Utah 1991)). Callahan has not properly challenged this finding. We therefore assume that the record supports the trial court's finding that EIMCO did not know of the facts giving rise to its cause of action until 1987. *See id.*[3]

■ In light of this finding, the trial court concluded that the statute of limitations did not bar EIMCO's claims. The trial court's conclusion was legally correct under the concealment theory. Callahan and G & G Steel concealed their activity by covertly misappropriating EIMCO trade secrets and other confidential information and then copying such information. As a result, EIMCO was not able to discover the misappropriation until late 1987. Therefore, the trial court properly ruled that the statute of limitations did not bar EIMCO's claims.[4]

---

3. Callahan attempts to avoid application of the discovery rule by arguing that EIMCO was aware that G & G Steel was competing against EIMCO prior to October 1984. However, this argument is not dispositive. Mere knowledge of the fact that G & G Steel was competing with EIMCO by itself was not enough to place EIMCO on notice that Callahan and G & G Steel had misappropriated confidential information and trade secrets. Not until G & G Steel began taking orders for parts that could only have been reasonably produced using confidential EIMCO drawings could EIMCO have had any reason to suspect that G & G Steel might be using confidential information and trade secrets in direct competition with EIMCO.

4. The statute of limitations could also be tolled under the exceptional circumstances theory. *Warren v. Provo City Corp.,* 838 P.2d 1125, 1129 (Utah 1992). If the plaintiff can prove due diligence, the court then determines the application of the discovery rule based on a balancing test: whether "[t]he hardship the statute of limitations would impose on the plaintiff in the circumstances of th[e] case outweigh[s] any prejudice to the defendant from difficulties of proof caused by the passage of time." *Myers v. McDonald,* 635 P.2d 84, 87 (Utah 1981); *accord Klinger v. Kightly,* 791 P.2d 868, 872 (Utah 1990). In light of the trial court's findings, it would be irrational and unjust to enforce a limitations bar to EIMCO's claims. The enforcement of the statute of limitations would work a severe hardship on EIMCO, and Callahan is not prejudiced by application of the discovery rule.

**494**

### Existence of Trade Secrets

Callahan argues that the trial court erred in ruling that all EIMCO detail drawings were subject to trade secret protection. Specifically, Callahan urges that the drawings should not be protected because they can be produced through reverse engineering.

 "A trade secret includes any formula, patent, device, plan or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know it." *J & K Computer Systems, Inc. v. Parrish*, 642 P.2d 732, 735 (Utah 1982); *accord Microbiological Research Corp. v. Muna*, 625 P.2d 690, 696 (Utah 1981).[5] A trade secret is a property right, "with power in the owner thereof to make use of it to the exclusion of the world or to deal with it as he pleases." *Muna*, 625 P.2d at 696. The subject matter of a trade secret "must be secret, and must not be of public knowledge or of a general knowledge in the trade or business." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 476, 94 S.Ct. 1879, 1883, 40 L.Ed.2d 315 (1974). "As a property right, the trade secret is protected against its appropriation or use without the consent of the owner." *Muna*, 625 P.2d at 696.

The protection accorded the trade secret holder is against the disclosure or unauthorized use of the trade secret by those to whom the secret has been confided under the express or implied restriction of nondisclosure or nonuse. The law also protects the holder of a trade secret against disclosure or use when the knowledge is gained, not by the owner's volition, but by some "improper means".... A trade secret law, however, does not offer protection against discovery by fair and honest means, such as by independent invention, accidental disclosure, or by so-called reverse engineering, that is by starting with the known product and working backward to divine the process which aided in its development or manufacture.

5. Utah recently adopted the Uniform Trade Secrets Act. *See* Utah Code Ann. § 13–24–1 to –9 (1992). However, because this section was

*Kewanee Oil*, 416 U.S. at 475–76, 94 S.Ct. at 1883 (citation and footnote omitted). Therefore, the extent of a property right in a trade secret is "defined by the extent to which the owner of the secret protects his interest from disclosure to others." *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1003, 104 S.Ct. 2862, 2872, 81 L.Ed.2d 815 (1984).

 The threshold question in a case like this is "whether, in fact, there is a trade secret to be misappropriated." *Muna*, 625 P.2d at 696. The burden of demonstrating the existence of a trade secret is on the plaintiff, and there is no presumption in his or her favor. *Id.*

"Thus, a unique combination of generally known elements or steps can qualify as a trade secret, if it represents a valuable contribution attributable to the independent efforts of the one claiming to have conceived it. The combination must differ materially from other methods revealed by the prior art. The subject matter of the trade secret must be unknown; it should not be in the public domain nor within the knowledge of the trade, i.e., known only to the owner and possibly several others to whom it was disclosed with the admonition that its secrecy be maintained ..."

. . . .

"A secret may not be in the public domain if extensive effort is required to pierce its veil by assembling the literature concerning it and thereby uncover its parts. If this can be readily done by one who is normally skilled in the field and has a reasonable familiarity with its trade literature, the secret may no longer be entitled to protections as such ..."

*Id.* (quoting 2 Callman, *Unfair Competition, Trademarks and Monopolies* § 53.3 (3d ed.)). What constitutes a trade secret is a question of fact. *Telex Corp. v. International Business Corp.*, 510 F.2d 894, 928 (10th Cir.) *cert. denied*, 423 U.S. 802, 96 S.Ct. 8, 46 L.Ed.2d 244 (1975); *Kodekey Elecs. Inc. v. Mechanex Corp.*, 486 F.2d 449, 455 (10th Cir.1973).

adopted after the events giving rise to this action had occurred it does not govern the disposition of this case.

■ In the present case, the trial court found that EIMCO went to great lengths to ensure that the information contained in its drawings remained confidential. The trial court found that each EIMCO drawing contained a legend that stated, "This drawing and all information thereon is the property of EIMCO, and is confidential and must not be made public or copied. This drawing is loaned subject to return upon demand; is not to be used directly or indirectly in any way detrimental to our interest." Moreover, the trial court found that written purchase orders placed by EIMCO with its vendors contained covenants: "(a) prohibiting the use of EIMCO drawings for the benefit of anyone except EIMCO; (b) retaining ownership in EIMCO of EIMCO property including EIMCO drawings; (c) obligating the vendors to retain EIMCO drawings as confidential."

The trial court also found that EIMCO had a Document Control Department that attempted to impose controls upon EIMCO's customers regarding the use of EIMCO general assembly and arrangement drawings and installation, operation, and maintenance manuals used for the operation and maintenance of EIMCO equipment. The Document Control Department also controlled the distribution of EIMCO detail drawings within EIMCO.

The trial court further found that EIMCO requires all employees seeking employment to complete an application for employment, which includes a Confidentiality Agreement. This agreement "obligates employees of EIMCO to not divulge EIMCO confidential or proprietary information to the detriment of EIMCO and, after their termination, to return to EIMCO any such material they may then have or later obtain." The trial court found that Callahan had executed such a Confidentiality Agreement.

Finally, the trial court found that EIMCO regards the following to be confidential and trade secret property: detail drawings, general arrangement drawings, general assembly drawings, hardware catalogues, operation and maintenance manuals, welding manuals, sales and engineering manuals, pricing manuals, customer application and installation lists, and technical reports. The trial court also found that EIMCO had taken reasonable and necessary steps to maintain the confidential nature of all the property for which it was claiming trade secret protection.

■ Callahan does not properly attack the findings of the trial court on this issue. He attempts to draw our attention to the testimony of his witnesses, which tends to be contrary to the findings, and he conveniently ignores the testimony of witnesses that support the findings. Callahan ignores his affirmative duty to properly attack the findings by marshaling the evidence. Because of Callahan's failure to marshal the evidence, we assume that the record supports the findings of the trial court. *See Ohline Corp.,* 849 P.2d at 604.

Based on its findings, the trial court properly concluded that all "EIMCO detail drawings in their entirety are the secret and confidential property of EIMCO; and EIMCO has the right at law to protect the same."[6] *See, e.g., A.H. Emery Co. v. Marcan Prods. Corp.,* 389 F.2d 11, 16 (2d Cir.) (drawings are prima facie trade secrets), *cert. denied,* 393 U.S. 835, 89 S.Ct. 109, 21 L.Ed.2d 106 (1968); *Drill Parts & Serv. Co. v. Joy Mfg. Co.,* 439 So.2d 43, 48–49 (Ala. 1983) (engineering drawings held to be trade secrets); *Boeing Co. v. Sierracin Corp.,* 108 Wash.2d 38, 738 P.2d 665, 673–74 (1987) (information in drawings that Boeing expended significant effort to keep confidential was held to be protectable trade secret).

Callahan argues, however, that even if the information is considered a trade secret, protection was lost when the information was placed in the public domain where it can be reverse engineered. This same argument was made unsuccessfully in *Boeing,* 738 P.2d at 674. In *Boeing,* defendant Sierracin, after losing a contract with Boeing to manufacture cockpit windows for a particular airplane, decided to continue manufacturing the windows for spare parts using confidential Boe-

---

**6.** The trial court found that EIMCO considered all of its drawings and property confidential trade secrets. The court concluded, however, that only EIMCO's detail drawings were entitled to trade secret protection.

ing engineering drawings despite explicit confidentiality agreements. The trial court held that Boeing's drawings were entitled to trade secret protection and that Sierracin had misappropriated Boeing's trade secrets. On appeal, Sierracin argued that since it could reverse engineer the windows, the Boeing drawings were not entitled to trade secret protection. There was conflicting testimony at trial as to whether Sierracin was actually capable of reverse engineering the windows. The Washington Supreme Court held that "[u]ntil Sierracin is [actually] able to reverse engineer the windows, that information possesses some novelty as yet disclosed only on the basis of confidentiality.... Hence the information should be characterized as trade secrets...." *Id.*

The dispositive question in the present case, therefore, is whether Callahan in fact obtained the information by the process of reverse engineering. The trial court found that Callahan and G & G Steel did not reverse engineer any drawings concerning EIMCO parts.[7] The trial court specifically found that Callahan and G & G Steel improperly obtained EIMCO drawings and then either redrew or copied the drawings onto paper containing the G & G Steel title block. Callahan has failed to properly challenge these findings. Because of Callahan's failure to marshal the evidence, we assume that the record supports the findings of the trial court. *See Ohline Corp.*, 849 P.2d at 604. Because Callahan did not reverse engineer the drawings, EIMCO's detail drawings did not lose their trade secret protection.

Trade secret protection applies to any unauthorized use of the trade secret by those to whom the secret has been confided under an express or implied restriction against disclosure or nonuse, or any disclosure or use when the knowledge is obtained by some improper means such as theft. *Kewanee Oil*, 416 U.S. at 475–76, 94 S.Ct. at 1883; *see also Kodekey*, 486 F.2d at 455 (trade secret protection is merely against breach of faith and

other reprehensible means of discovering another's secret). The trial court found that Callahan and G & G Steel had obtained confidential information and trade secrets through improper means. In light of the findings and the applicable law, the trial court did not err in concluding that Callahan and G & G Steel misappropriated confidential information and trade secrets of EIMCO.

We therefore conclude that the trial court did not err in holding that EIMCO's detail drawings were trade secrets. We also conclude that the trial court did not err in holding that Callahan and G & G Steel did not reverse engineer any drawings. We further conclude that the trial court did not err in holding that Callahan and G & G Steel had obtained EIMCO trade secrets by improper means.

### Fiduciary Duty

Callahan argues that he did not owe any fiduciary duty to EIMCO three years after his termination. Callahan claims that he did not have an employment contract and that, if the employment application he signed can be construed so as to create a fiduciary duty not to use confidential information and trade secrets after termination, it was a contract of adhesion and therefore unenforceable.[8]

A former employee may not use confidential information obtained during the course of his or her employment to compete after termination with his or her former employer. *See Muna*, 625 P.2d at 697 (upon termination, employee may use "general knowledge, experience, memory and skill, however gained, provided he does not use, disclose, or impinge upon any of the secret processes or business secrets of his former employer"). A written contract or formal employment contract is not required in order to create this duty. "It is settled ... that the duty of an employee not to disclose confidential information is grounded on 'basic

---

7. An EIMCO engineer with considerable experience testified that it would be virtually impossible to properly reverse engineer an EIMCO filter.

8. Callahan expends considerable effort arguing that his employment application did not contain a non-competition provision. However, Calla-

han misconstrues the meaning of the fiduciary duty found to exist by the trial court. Callahan is not restricted from competing, he is merely restricted from using confidential information or trade secrets of EIMCO while competing.

principles of equity' ... and upon an implied contract, growing out of the nature of the employer-employee relation." *Eastern Marble Products Corp. v. Roman Marble, Inc.,* 372 Mass. 835, 364 N.E.2d 799, 803 (1977) (quoting *Jet Spray Cooler, Inc. v. Crampton,* 361 Mass. 835, 282 N.E.2d 921, 924 (1972)).

"In situations where there has been no express contract of an employee not to use or disclose confidential information entrusted to him during his employment, this court has held that, although an employee may carry away and use general skill or knowledge acquired during the course of his employment, he may be enjoined from using or disclosing confidential information so acquired."

*Id.* (quoting *Essex Trust Co. v. Enwright,* 214 Mass. 507, 102 N.E. 441 (1913)). "This duty does not necessarily turn on the existence of a legally enforceable contract." *Id.; see also* 53 Am.Jur.2d *Master and Servant* § 104 (1970) (former employee cannot use former employer's trade secrets learned during employment even though there was no express contract precluding use of such trade secrets).

In the present case, the trial court found that Callahan had a fiduciary duty to EIMCO while he was employed by EIMCO. The trial court further found that Callahan did not act to preserve the property of EIMCO, and that Callahan took with him confidential information belonging to EIMCO when he left his employment with EIMCO. Callahan has failed to properly challenge these findings. We therefore assume that the record supports the findings of the trial court. *See Ohline Corp.,* 849 P.2d at 604. In light of these findings, the trial court properly ruled that Callahan owed a fiduciary duty to EIMCO that he breached.

Since an express contract creating a fiduciary duty running from Callahan to EIMCO was not necessary in this case, Callahan's arguments that he did not have an employment contract or that his employment application did not create a fiduciary duty are not persuasive. In light of the findings and the applicable law, the trial court did not err in holding that Callahan had a fiduciary duty to

EIMCO to preserve and protect EIMCO property, and that Callahan breached his duty by taking confidential EIMCO property with him when his employment was terminated and by obtaining confidential EIMCO property from other sources.

## CALLAHAN'S APPEAL
## FROM JUDGMENT
## OF CONTEMPT

Callahan appeals from the trial court's ruling holding him in contempt under Utah Code Ann. § 78–32–1(4) and (5) (1992), for violating the court's preliminary injunction. Callahan also challenges the trial court's order requiring him to pay to EIMCO $5,000, and costs and attorney fees pursuant to Utah Code Ann. § 78–32–11 (1992). Callahan challenges the legality of the injunction as well as several of the trial court's findings supporting the judgment of contempt. "This Court's review of a contempt citation involves two questions: first, whether the underlying order is lawful; and second, whether the party's conduct in violating the order constitutes contempt of court." *Utah Farm Prod. Credit Ass'n v. Labrum,* 762 P.2d 1070, 1074 (Utah 1988) (citing *Mellor v. Cook,* 597 P.2d 882, 884 (Utah 1979)).

### Legality of Injunction

Callahan argues that the preliminary injunction issued after the trial court's oral ruling in the main case did not comply with Rule 65A of the Utah Rules of Civil Procedure and that therefore there was no legal basis for issuing it. We disagree.

■■■■ We will not disturb a trial court's decision to grant or deny an injunction unless the "court abused its discretion or the judgment rendered is clearly against the weight of the evidence." *Birch Creek Irrigation v. Prothero,* 858 P.2d 990, 993 (Utah 1993). Rule 65A(e)(3) of the Utah Rules of Civil Procedure, in effect at the time of trial,[9] allowed the trial court to issue a preliminary injunction "when it appears during the litigation that either party is doing or threatens, or is about to do, or is procuring or suffering

9. Rule 65A was amended, effective September 1, 1991.

to be done, some act in violation of the rights of another party respecting the subject matter of the action, and tending to render the judgment ineffectual." *Id.* This rule gave a trial court discretion to impose an injunction prior to entry of final judgment, where a party might frustrate the judgment of the court. In the present case, the preliminary injunction issued by the court complied with Rule 65A of the Utah Rules of Civil Procedure.[10]

■ Furthermore, even if the order did not strictly comply with Rule 65A, any error in its issuance is harmless. When the court issued the preliminary injunction, it indicated that it was merely reducing to writing the injunctive relief it granted to EIMCO in its oral ruling. Therefore, the trial court could have held Callahan in contempt for violating its oral ruling to the same extent that it held him in contempt for violating the preliminary injunction. *See, e.g., Robertson v. Commonwealth*, 181 Va. 520, 25 S.E.2d 352, 355–56 (1943) (in order for mandate to be in effect, for purposes of holding person in contempt for its violation, it need not be formal written order); *State ex rel. Walker v. Giardina*, 170 W.Va. 483, 294 S.E.2d 900, 904–05 (W.Va. 1982) (individual who knows of existence of oral ruling and violates its provisions may be held liable for contempt).

We conclude, therefore, that the trial court did not abuse its discretion by enjoining Callahan from engaging in activities that would frustrate the court's oral ruling.

## Finding of Contempt

Callahan argues that the trial court erred in holding him in contempt under Utah Code Ann. § 78–32–1(4) and (5) (1992), for engaging in certain activities at C–H.

Section 78–32–1(4) provides that a party may be held in contempt for "[d]eceit, or abuse of the process or proceedings of the court." *Id.* Additionally, section 78–32–1(5) provides that a party may be held in contempt for "[d]isobedience of any lawful judgment, order or process of the court." *Id.*

"To be held in contempt, a party must have (1) known of the duty imposed by the court's order, (2) had the ability to comply with the order, and (3) willfully and knowingly refused to comply." *Utah Farm*, 762 P.2d at 1074 (citing *Coleman v. Coleman*, 664 P.2d 1155, 1156 (Utah 1983)). The party challenging the trial court's findings of contempt on appeal "has the burden of demonstrating that, viewed in the light most favorable to the trial court, the evidence at trial was insufficient to support the trial court's findings." *Id.* at 1075 (citing *Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985)).

■ The trial court found that C–H was "formed by and for Callahan and for the purpose of avoiding the orders of this court and to avoid the judgments of this court." The court further found that Callahan knew about the preliminary injunction and knew that it prohibited G & G Steel from transferring its assets. The court also found that Callahan did not seek advice of counsel or the court as to what activities were permissible under the preliminary injunction. Finally, the court found that Callahan set up C–H to do what he believed could not be done through G & G Steel.

Callahan has not properly challenged these findings. Therefore, we accept the findings as accurate and assume that they are supported by the record. *See Ohline*, 849 P.2d at 604; *Utah Farm*, 762 P.2d at 1074. Based on these findings, the trial court concluded that Callahan set up C–H to operate as a "subterfuge to evade the orders of this

---

10. Rule 65A(a) also required that no preliminary injunction could issue without notice to the adverse party. In the present case, Callahan was given adequate notice and a chance to be heard before the court issued the injunction. Additionally, Rule 65A(c) required that the party requesting the injunction must file sufficient security with the court to compensate the enjoined party if the injunction was later deemed improper. However, a court could dispense with the security requirement if the granting of the injunction carried no risk of monetary loss to the enjoined party. *Corporation of the President of the Church of Jesus Christ of Latter-Day Saints v. Wallace*, 573 P.2d 1285, 1286–87 (Utah 1978) (citing 11 Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 2954 (Supp.1976)). In the present case, there could be no additional monetary loss to Callahan as a result of the preliminary injunction because he was merely enjoined consistent with the oral ruling of the court.

court." The court further concluded that Callahan "obviated and circumvented the [preliminary injunction] by first creating G & G Products and then C–H, and transferring the business of G & G Steel through G & G Products to C–H, thereby doing what he was restrained from doing." The court accordingly ruled that Callahan was in contempt of court, ordered him to pay to EIMCO $5,000, and ordered him to pay EIMCO's attorney fees and costs associated with bringing the contempt proceeding.

The trial court's findings indicate that Callahan knew of the duty imposed on him by the preliminary injunction, had the ability to comply, and "willfully and knowingly refused to comply." *Utah Farm,* 762 P.2d at 1074. Because Callahan disobeyed a lawful order and otherwise attempted to deceive the court, the trial court did not err in holding Callahan in contempt of court pursuant to Utah Code Ann. § 78-32-1(4) and (5), as a result of activities he conducted at C–H.[11]

### Alter Ego

Callahan argues that the trial court erred in concluding that C–H was his alter ego. The trial court found that Mrs. Callahan was the sole shareholder and president of C–H and that she and Callahan were the initial directors of C–H. The court also found that C–H was formed to succeed to the business of G & G Steel, and was formed so that Callahan would have a job and could continue in the same business as G & G Steel. The court further found that C–H took over most of the uncompleted contracts of G & G Steel and that over eighty percent of the customers of C–H were customers of G & G Steel. Moreover, the court found that Callahan, with the assistance of Mrs. Callahan, caused the business of G & G Steel to be transferred to C–H without compensation to G & G Steel. Finally, the court found that C–H was formed by and for Callahan for the purpose of avoiding the orders and judgments of the court. Callahan does not properly attack these findings. We therefore assume that the record supports the trial court's findings. *See Ohline,* 849 P.2d at 604. Based on these findings, the trial court concluded that C–H was Callahan's alter ego.

▇ In order to disregard the corporate entity under the equitable alter ego doctrine, two circumstances must be present: "(1) Such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, but the corporation is, instead, the alter ego of one or a few individuals; and (2) if observed, the corporate form would sanction a fraud, promote injustice, or result in an inequity." *Colman v. Colman,* 743 P.2d 782, 786 (Utah App.1987); *accord Norman v. Murray First Thrift & Loan Co.,* 596 P.2d 1028, 1030 (Utah 1979).

▇ The trial court's findings are sufficient to support its conclusion that C–H was Callahan's alter ego under the *Colman* criteria. First, the findings indicate that Callahan played a major role in forming and operating C–H. Second, the trial court found that Callahan established C–H for the purpose of avoiding orders and judgments of the court. Moreover, the trial court's findings indicate that C–H was formed for the purpose of allowing Callahan to continue in the business of selling parts for EIMCO machines. Callahan and C–H therefore had a unity of interest and ownership. To allow C–H to avoid orders and judgments directed at Callahan would "sanction a fraud, promote injustice, or result in an inequity." *Colman,* 743 P.2d at 786. We therefore conclude that the trial court did not err in ruling that C–H was the alter ego of Callahan.

### Contempt Sanction and Attorney Fees

▇ Callahan argues that the trial court erred by ordering him to pay to EIMCO $5,000 for his contempt citation pursuant to Utah Code Ann. § 78-32-11 (1992). Section 78-32-11 provides:

> If an actual loss or injury to a party in an action or special proceeding, prejudicial to his rights therein, is caused by the contempt, the court, in addition to the fine or imprisonment imposed for the contempt or in place thereof, may order the person

---

11. The trial court also found Callahan in contempt for misrepresenting his income and assets at trial. Callahan does not challenge this part of the contempt order.

proceeded against to pay the party aggrieved a sum of money sufficient to indemnify him and to satisfy his costs and expenses.

*Id.* In a contempt proceeding for a violation of an injunction, the extent of the sanctions rests within the sound discretion of the trial court. *Ward v. Richfield City,* 798 P.2d 757, 759 (Utah 1990) (citation omitted). Callahan has failed to demonstrate how the sanctions imposed constitute an abuse of discretion by the trial court under section 78–32–11. We therefore conclude that the trial court did not abuse its discretion by ordering him to pay to EIMCO $5,000.

■ Additionally, Callahan argues that the trial court abused its discretion by ordering him to pay EIMCO's attorney fees and costs. Attorney fees may be awarded in a contempt proceeding brought for a party's failure to comply with an order. *See* Utah Code Ann. § 78–32–11 (1992); *Bradshaw v. Kershaw,* 627 P.2d 528, 533 (Utah 1981). Callahan provides no support for his argument and fails to demonstrate how the trial court abused its discretion in ordering him to pay EIMCO's attorney fees and costs. We therefore conclude that the trial court did not abuse its discretion in awarding attorney fees and costs in the contempt proceeding.

## EIMCO'S CROSS APPEAL

EIMCO requested that the trial court enjoin Callahan from contacting EIMCO customers and selling parts for EIMCO machines for up to five years. The trial court denied this request. EIMCO argues on appeal that the trial court abused its discretion by denying the five-year injunction.

The decision to grant or deny injunctive relief lies within the sound discretion of the trial court. *Harline v. Campbell,* 728 P.2d 980, 984 (Utah 1986). We will not overturn a decision to grant or deny injunctive relief on appeal unless "it can be said the court abused its discretion, or that the judgment rendered is clearly against the weight of the evidence." *System Concepts, Inc. v. Dixon,* 669 P.2d 421, 425 (Utah 1983) (quoting *Johnson v. Ward,* 541 P.2d 182, 188 (Okla.1975)).

■ In the present case, the trial court granted EIMCO considerable injunctive relief. The court awarded EIMCO a permanent injunction and order compelling Callahan to return all EIMCO property and materials obtained from any existing or former employee. The court further enjoined Callahan from obtaining EIMCO detail drawings and all other EIMCO confidential and trade secret information by: "[a] seeking them from former EIMCO employees; [b] seeking them from retired EIMCO employees; [c] seeking them from EIMCO vendors; and [d] seeking them from any other party who has a duty to preserve such drawings and not disclose them to others." The court also permanently enjoined Callahan from

> competing with EIMCO by using any property of EIMCO, from competing with EIMCO by using any information obtained from a detail drawing of EIMCO directly or from another including vendors of EIMCO and vendors of G & G Steel, from competing with EIMCO by using any other confidential information of EIMCO and from competing with EIMCO by using any confidential drawings and other confidential property of G & G Steel.

In light of the relief actually granted, the trial court did not abuse its discretion by denying EIMCO's request for further injunctive relief. While Callahan may try to compete with EIMCO, he may not use any of the information he previously misappropriated, and he may not misappropriate any additional information in the future. This injunctive relief therefore essentially strips Callahan of any competitive advantage without the need for additional injunctive relief. The injunctive relief granted by the trial court, in combination with the damages awarded to EIMCO as a result of Callahan's activities, adequately protects EIMCO against any unfair competition by Callahan. The trial court did not therefore abuse its discretion by refusing to grant EIMCO further injunctive relief.

## ATTEMPTED INTERVENTION BY C–H

C–H requests permission to intervene for the first time on appeal, arguing that the trial court's judgments and writs are void as against it for lack of jurisdiction and violation

of due process of law. C–H also argues that the trial court's finding that it was the alter ego of Callahan is clearly erroneous.

C–H may not intervene for the first time on appeal. Rule 24 of the Utah Rules of Civil Procedure provides that a party may intervene under proper circumstances. However, the rule contemplates timely intervention at the trial court and not for the first time on appeal. Under the rule, postjudgment intervention even in the trial court is generally not permitted. *See Jenner v. Real Estate Servs.*, 659 P.2d 1072, 1074 (Utah 1983). In *Jenner*, the Utah Supreme Court held that postjudgment intervention should be allowed only upon a strong showing of entitlement and justification, or such unusual circumstances justifying the failure to seek intervention earlier. *Id.* We therefore conclude that C–H may not intervene for the first time on appeal.[12]

## CONCLUSION

Callahan does not have standing to challenge the writs of replevin and assistance and therefore cannot object to the admission of evidence seized pursuant thereto. The trial court correctly concluded that the statute of limitations did not bar EIMCO's claims. The trial court did not err in concluding that EIMCO's detail drawings constituted trade secrets, which Callahan misappropriated. The trial court did not err in concluding that EIMCO was entitled to trade secret protection because Callahan did not reverse engineer the drawings. The trial court did not err in concluding that Callahan owed to EIMCO a fiduciary duty that he breached by taking confidential materials with him when his employment with EIMCO was terminated and, later, by misappropriating EIMCO trade secrets and other confidential information.

The trial court did not abuse its discretion in issuing a preliminary injunction. The trial court did not err in holding Callahan in contempt of court for violating the preliminary injunction. The trial court did not abuse its discretion in ruling that C–H was Callahan's alter ego. The trial court did not abuse its discretion by ordering Callahan to pay to EIMCO $5,000 and attorney fees and costs associated with the contempt proceedings.

The trial court did not abuse its discretion by refusing to grant EIMCO additional injunctive relief. C–H may not intervene for the first time on appeal.

We have reviewed the other issues raised and find them to be without merit. *See State v. Carter*, 776 P.2d 886, 896 (Utah 1989) (appellate court need not analyze and address every argument, issue, and claim raised). The judgments of the trial court are affirmed. EIMCO's request for costs and attorney fees on appeal pursuant to Rule 33(c)(1) of the Utah Rules of Appellate Procedure is denied.

JACKSON and DAVIS, JJ., concur.

---

12. A judge on this court granted a motion that allowed C–H to file briefs and argue that they were properly before this court as an intervenor. Rule 23(e) of the Utah Rules of Appellate Procedure allows a single judge on this court to "entertain and ... grant or deny any request for relief which under these rules may properly be sought by motion." However, this rule also allows a panel of this court to review the actions of the single judge. *Id.* We have reviewed the motion and C–H's arguments and conclude that C–H may not intervene on appeal.